STATE OF NORTH CAROLINA v. FREDDIE LEE IRICK, ALIAS
WILLIE LEE SMITH

No. 162

(Filed 31 January 1977)

**1. Criminal Law § 92— four charges — consolidation proper**

The trial court did not err in consolidating for trial two charges
against defendant for first degree burglary and two charges of assault
with a firearm upon a law enforcement officer, since both burglaries
and the confrontation with the police occurred within a two hour
time span; all the alleged offenses occurred in the same neighborhood;
and the evidence indicated a common plan to burglarize homes of the
neighborhood and escape by means of a stolen vehicle parked nearby.

**2. Criminal Law § 60— fingerprints — time of impression — question of
fact**

The question of whether fingerprints could have been impressed
only at the time a crime was committed is a question of fact for the
jury and not a question of law to be determined by the court prior
to the admission of fingerprint evidence.

**3. Criminal Law § 60— fingerprints — nontestimonial identification —
defendant in custody — Criminal Procedure Act provisions inapplicable**

The provisions of Article 14 of Chapter 15A concerning nontesti-
monial identification do not apply to accused persons in custody, but
instead apply only to suspects and accused persons before arrest, and
to persons formally charged and arrested who have been released
from custody pending trial.

**4. Burglary and Unlawful Breakings § 5— first degree burglary — suf-
ficiency of evidence**

Evidence was sufficient for the jury in a first degree burglary
case where it tended to show that defendant's fingerprint was found
on the inside frame of a window in the house allegedly broken into;
defendant was observed by a police officer coming from the general
direction of the burglarized home shortly after the burglary tran-
spired; defendant had in his pocket at the time of his arrest loose
bills in the same denominations and total amount as those stolen from
the house in question; and defendant attempted to flee from police
officers shortly after the burglaries took place.

**5. Criminal Law §§ 51, 99— expert witness — finding of expertise in
jury's presence — no expression of opinion**

The trial court did not express an opinion on the credibility of
a witness in violation of G.S. 1-180 by determining in the presence of
the jury that the witness was an expert in the field of fingerprint
comparisons.

State v. Irick

**6. Criminal Law § 46— flight of defendant — sufficiency of evidence to support instruction**

So long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged, an instruction on flight is properly given, and the fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper.

**7. Criminal Law § 46— flight of defendant — sufficiency of evidence to support instruction**

In a prosecution for burglary, the evidence was sufficient to support an instruction on flight where it tended to show that defendant came from the direction of the burglarized homes shortly after the burglaries took place; he entered and drove off in a vehicle which police knew to be stolen; when defendant was followed by marked yellow patrol cars, he accelerated and turned into a parking lot; when his car became wedged between police cars, he jumped from his car as it was still moving and ran away; when ordered to halt, defendant ignored police officers and continued to run; when officers fired at defendant, he drew a pistol and returned their fire; and defendant was subsequently found hiding in the cab of a dump truck.

**8. Criminal Law § 44— tracking by bloodhound — admissibility of evidence**

In a prosecution for first degree burglary and assault with a firearm upon a law enforcement officer, the trial court did not err in admitting testimony concerning tracking by a bloodhound where the evidence supported the court's findings that the dog was of proper pedigree, training, and experience; moreover, the fact that the dog was not exposed to an article carrying defendant's scent before the tracking began did not render the tracking suspect, since it was sufficient that the dog was taken to the place where defendant was last observed.

**9. Criminal Law § 73— radio dispatches — testimony not hearsay**

In a prosecution for first degree burglary and assault with a firearm upon a law enforcement officer, the trial court did not err in allowing an officer to testify concerning radio dispatches made by another officer during events culminating in defendant's arrest, since such testimony was admissible (1) to explain the conduct of two officers in chasing a suspect vehicle which defendant was driving, and (2) as part of the *res gestae*.

**10. Criminal Law § 73— testimony as to contents of wallet — no hearsay**

In a prosecution for first degree burglary, the trial court did not err in allowing a witness whose home was broken into to testify as to how much money her husband's billfold contained prior to the burglary, since such testimony was not hearsay but was based on the witness's own knowledge.

**11. Assault and Battery § 14— assault with firearm upon law officer — sufficiency of evidence**

In a prosecution for assault with a firearm upon a law enforcement officer, evidence was sufficient to support the inference that defendant must have known that his pursuers were law enforcement officers who were performing their duty where such evidence tended to show that officers had a stolen vehicle under surveillance; when defendant entered the vehicle and drove it away, officers who were in uniform and who were driving marked, bright yellow police cars gave pursuit; as officers followed the automobile, it accelerated and turned abruptly into a parking lot; the officers tried to block the car and a collision resulted; after the collision defendant jumped from the car and began to run; the officers could see defendant's face and clothes; one of the officers got out of his car and called for defendant to halt; defendant continued to run and the officer fired at him; and the defendant returned fire.

**12. Arrest and Bail § 5; Assault and Battery § 5— assault on officer performing duties — excessive force used to arrest — officer not removed from performance of duties**

While the use of excessive force in a lawful arrest may subject a law enforcement officer to civil or criminal liability, it does not take the officer outside the performance of his duties for the purposes of G.S. 14-34.2, the statute making it a felony to commit an assault with a firearm upon a law enforcement officer while he is engaged in his duties.

**13. Assault and Battery § 16— assault with firearm on officer — failure to submit lesser offenses — no error**

In a prosecution for assault with a firearm upon a law enforcement officer where all the evidence tended to show that defendant pulled a gun from his waistband and fired at two officers who were attempting to arrest him for possession of a stolen vehicle, the trial court did not err in failing to instruct on lesser included offenses.

**14. Criminal Law §§ 26, 140— two officers assaulted — two prison terms — no error**

Defendant's act in firing a gun at two officers constituted two assaults, and the imposition of consecutive prison sentences for the two assault convictions was proper.

**15. Burglary and Unlawful Breakings § 8; Criminal Law §§ 102, 138— first degree burglary — mandatory life imprisonment — right to argue to jury**

In a prosecution for first degree burglary, the trial court erred in refusing to permit defense counsel to tell the jury in his final argument that the law prescribed mandatory life imprisonment for first degree burglary; but it was not error for the court to fail to inform prospective jurors of the punishment prior to their selection or to fail to advise the jury of the mandatory life sentence in its final charge. G.S. 84-14.

DEFENDANT appeals pursuant to G.S. 7A-27(a) from judgment of *Barbee, S.J.*, entered 19 June 1976 during Schedule "C" Session of MECKLENBURG Superior Court. Defendant's convictions of assault on a law enforcement officer with a firearm were certified for initial appellate review by the Supreme Court pursuant to G.S. 7A-31(a) on 25 October 1976.

On indictments, proper in form, defendant was charged with two counts of first degree burglary and two counts of assault on a law enforcement officer with a firearm. He was found not guilty of one count of first degree burglary and guilty as charged as to the remainder. The court imposed the mandatory life sentence for the first degree burglary conviction, a five year sentence to run concurrently with the burglary sentence for one assault conviction and a sentence of five years for the second assault conviction to commence at the expiration of the first assault sentence.

The evidence for the State tended to show the following:

Mrs. Alberta Wood, a resident of a subdivision in Mecklenburg County known as Moore's Park, went to bed about 11:45 p.m. on 6 January 1976 after checking her front and back doors to be sure they were locked. Sometime after midnight, she heard her Irish Setter dog barking. The barking aroused her suspicion because the dog had cancer of the throat and had not barked for a few months. Mrs. Wood found the dog standing in the living room facing the dining room. The dining room window, which had been closed and locked, was wide open. Mrs. Wood slammed it down and locked it. She went through the kitchen and den but found nothing unusual. She called her daughter next door who sent over her boyfriend to assist. Upon further investigation, Mrs. Wood discovered that the back door was unlocked, that some other windows were unlatched, and that a trash can had been moved in the kitchen. The police were called.

Officer Shaw of the Mecklenburg County Police Department received a radio dispatch to proceed to the Wood home on Teresa Avenue. At the time of the call, he was parked several blocks away in a vacant Phillips 66 Service Station lot at the corner of Little Rock Road and Wilkinson Boulevard. As he was leaving that location, he noticed a green Dodge automobile parked on the other side of the Phillips 66 building. This automobile matched the description of a stolen vehicle for which Officer Shaw had been searching several days. He informed

police headquarters and requested the dispatcher to send another car out to identify the suspect vehicle.

Officer Shaw drove to the Wood home and remained there until other officers arrived. He then returned to the Phillips Station where Officer Patton by that time had the green Dodge under surveillance. Officer Shaw stationed himself at a nearby lot where he was soon joined by Officer Bailey. Both of these officers were in uniform and driving marked, bright yellow county police department vehicles.

About 2 a.m. Officer Patton advised Officer Shaw that a subject, coming from behind the Phillips Station, was entering the green Dodge. A few seconds later the suspect vehicle backed up and drove out of the Phillips Station lot with its headlights off. When it reached Little Rock Road the lights came on. Officers Shaw and Bailey gave pursuit. The green Dodge accelerated and turned into the Cloud Nine Lounge parking lot. Officer Bailey followed the suspect car around the building. Officer Shaw drove around the other side of the building to block the vehicle. The green Dodge became wedged between the police cars and collided with both of them.

Before the suspect car stopped moving, the driver jumped out from the passenger side and started running. Officer Shaw jumped from his car and ordered the suspect to halt. When he failed to do so, Officer Shaw fired at him but the driver of the Dodge continued to run. Officer Bailey pursued the suspect. The driver reached in his waistband, pulled out a gun and fired. Officer Bailey returned the fire. The driver ran across the street and disappeared into a used car lot.

When the suspect fired his pistol, Officers Bailey and Shaw were about 20 to 25 feet apart. They observed the weapon pointed in their general direction, saw flashes, and heard three to four shots.

After the suspect disappeared, the officers radioed for assistance. When other units arrived they sealed off the neighborhood. Mr. Overcash arrived with a trained bloodhound by the name of Snoopy. The dog was taken to the area where the suspect was last seen. Snoopy picked up a scent and led the men to a fence bordering the used car lot. The dog appeared to want to go inside the fence. The used car lot was ordered surrounded. The officers heard the sound of metal against metal. A search was made of the vacant trucks in the used car lot.

About 4:14 a.m. the driver of the green Dodge was found in the cab of a dump truck. He had been wounded and was bleeding. The driver, identified as the defendant, was taken into custody and relieved of a .38 caliber pistol. The gun contained four spent shells and one live round. A search of the defendant produced $100 in paper money (three $20's, two $10's, two $5's, and ten $1's). Defendant was taken to the hospital.

At the request of Officer Shaw, Mr. Overcash, the bloodhound handler, took the dog to the Wood house to see if he could pick up a scent. The bloodhound picked up a track under the dining room window and followed it through the Wood's backyard to another backyard a block away. The dog appeared confused at that point so his handler took him around the house. There he regained the scent and led his handler several more blocks, finally stopping at the Phillips 66 Service Station where the green Dodge had first been observed.

In the meanwhile, another strange occurrence had been discovered at the Hipp residence, in Moore's Park, a few blocks from the Wood residence. About 3 a.m. Mrs. Hipp awoke and went to the bathroom. There she noticed a pair of pants on the floor. Thinking that they were her daughter's bluejeans, she paid no attention to them and returned to bed. When she got up at 6 a.m. and saw her husband's wallet lying on a pile of laundry in the bathroom, she realized that the pants she had observed earlier were those of her husband. The night before he had placed them on a chair in the bedroom. The wallet had been in the pants pocket and had contained $60 when they went to bed. The wallet was empty.

Looking further around the bathroom, Mrs. Hipp spotted her change purse lying on a hamper. It was also empty. The night before the purse had been in the pocket of her car coat which had been hanging in the bathroom. Mrs. Hipp remembered having about $45 in the purse before she went out to dinner the previous evening. She recalled that she had spent some of the $45 on her dinner. She reported to the police that approximately $100 had been taken from her and her husband consisting of three $20's, two $10's, two $5's and some $1's.

While waiting for the police to arrive, she went downstairs and found two outside doors open. Both doors had been locked the night before. She discovered a piece of pasteboard, which had covered a broken window in the basement, lying on the

ground outside and a box of kleenex, which had been on the window sill, lying on the floor inside. Later in the morning as she was looking through the house again, she found a dirty dish towel which she had never seen before. In the meantime, a few blocks away, Mrs. Wood had discovered that a dish towel, which belonged to a set of matched towels, was missing from her kitchen.

When the police arrived at the Hipp home about 6:30 a.m., they searched the house and dusted for fingerprints around the window sill. One identifiable print was removed. This latent print matched a fingerprint of defendant's right little finger.

Mrs. Wood reported to the police that her dish towel, which had been hanging on a rack beside the kitchen door, was missing. Mrs. Wood had fed her cat before retiring and remembered wiping her hands on the towel. An officer arrived at her home bringing the dish towel discovered at Mrs. Hipp's house. This towel matched the rest of Mrs. Wood's set, smelled of cat food, and appeared to be Mrs. Wood's missing towel.

The defendant's evidence tended to show the following:

Officer Dennis of the Mecklenburg County Police Department, who investigated the incident at the Wood home, reported that no fingerprints were found on the window sill where the window had been opened, that the window sill was still covered with dust, and that no pry or force marks were found on the window inside or outside. His report indicated that he "[c]ould not believe any entry was gained" and labeled the crime being investigated an "attempted first degree burglary." Officer Dennis admitted on cross-examination that Mrs. Wood told him some facts that would have indicated an entry but which he failed to include in his report.

Officer Mathis of the Mecklenburg County Police Department testified that he conducted the investigation at the Hipp house. According to his report, the Hipps reported missing $100 and Mr. Hipp's plaid sport coat. This coat was never found. The officer's report did not mention the dirty dish towel.

We have found it difficult to ascertain the facts from the 26 pages of the brief submitted by appellant for this purpose. Rule 28(b)(2) of the Rules of Appellate Procedure provides, among other things, that the appellant's brief ". . . should additionally contain a *short,* non-argumentative *summary* of the

essential facts underlying the matter in controversy where this will be helpful to an understanding of the questions presented for review." (Emphasis added.) Fortunately, the State's brief presented a clear and concise statement of the facts.

Other facts necessary to the decision will be discussed in the opinion.

*Attorney General Rufus L. Edmisten by Associate Attorney Elizabeth C. Bunting for the State.*

*William O. Austin for defendant appellant.*

COPELAND, Justice.

[1] Prior to trial, the State moved to consolidate the four charges against the defendant for trial (defendant had also been indicted for larceny of an automobile but the State wisely did not request joinder of this offense as it was apparently unconnected). The State's motion was granted. Defendant objected and moved to sever the cases, which motion was denied. Defendant properly renewed his motion for a severance during the trial as required by G.S. 15A-927(a)(2).

In his first assignment of error defendant contests both the consolidation of the cases and the denial of his motion for a severance. We first note that defendant failed to comply fully with Rule 10(c) of the North Carolina Rules of Appellate Procedure in that Exception No. 36 is not grouped under Assignment of Error No. 1 in the record. Nevertheless, we will discuss briefly defendant's contentions.

G.S. 15A-926(a) allows the trial court to consolidate for trial two or more offenses when the offenses "are based on the same act or transaction or on a series of acts or transactions connected together or constituting parts of a single scheme or plan." Consolidation is a discretionary matter with the trial judge. *State v. Harding,* 291 N.C. 223, 230 S.E. 2d 397 (1976); *State v. Jarrette,* 284 N.C. 625, 202 S.E. 2d 721 (1974).

As Judge Barbee observed, the State's evidence tended to show connection of these offenses in time, place and circumstance. Both burglaries and the confrontation with the police occurred within a two-hour time span; all the alleged offenses occurred in and around Moore's Park Subdivision in Mecklenburg County. The evidence indicated a common plan to burglar-

ize homes of the neighborhood and escape by means of a stolen vehicle parked nearby.

By statute, the court is required to grant a severance of offenses, whenever it is necessary for "a fair determination of the defendant's guilt or innocence of each offense." G.S. 15A-927(b). In deciding on a motion for a severance, the court is instructed to consider, whether, "in view of the number of offenses charged and the complexity of the evidence to be offered, the trier of fact will be able to distinguish the evidence and apply the law intelligently as to each offense." G.S. 15A-927(b)(2).

No showing has been made that a severance was necessary in this case to insure a fair determination by the jury on each charge. The evidence presented was not unusually complicated or confusing. Judge Barbee clearly and carefully separated the offenses in his instructions. The jury's ability to differentiate between the offenses was evidenced by its verdict of *NOT GUILTY* in 76 CR 2983 (Wood first degree burglary).

For the judge to have put the State to four separate trials would have been unthinkable. Consolidation conserved judicial time and energy and defendant was unharmed by this economy. This assignment of error is without merit and overruled.

[2] In his next assignment of error, defendant challenges the admissibility of the fingerprint comparison. Defendant contends the expert testimony comparing the fingerprint lifted at the Hipp home and defendant's own fingerprint should not have been admitted into evidence until after a showing that the print could only have been impressed at the time the crime was committed. We believe defendant has misconstrued our cases on this subject. The effect of defendant's argument, if adopted, would be to require an absolute showing that defendant was a criminal participant before fingerprint evidence could be admitted. This we have not held nor are we so inclined to hold now.

In *State v. Miller*, 289 N.C. 1, 220 S.E. 2d 572 (1975), we noted the accuracy and general use of fingerprint evidence for identification purposes. The only limitation this Court has imposed on the admissibility of fingerprint comparisons to prove the identity of the perpetrator of a crime is a requirement that the testimony be given by an expert in fingerprint identification. *State v. Tew*, 234 N.C. 612, 68 S.E. 2d 291 (1951); *State*

*v. Helms,* 218 N.C. 592, 12 S.E. 2d 243 (1940) ; *State v. Huff-man,* 209 N.C. 10, 182 S.E. 705 (1935) ; *State v. Combs,* 200 N.C. 671, 158 S.E. 252 (1931). We have repeatedly said that the testimony of a fingerprint expert is "competent as evidence tending to show that defendant was present when the crime was committed and that he at least participated in its commission." *State v. Tew, supra* at 617, 68 S.E. 2d at 295; *accord, State v. Helms, supra; State v. Huffman, supra; State v. Combs, supra.*

The probative force, not the admissibility, of a correspondence of fingerprints found at the crime scene with those of the accused, depends on whether the fingerprints could have been impressed only at the time the crime was perpetrated. *See State v. Miller, supra; State v. Minton,* 228 N.C. 518, 46 S.E. 2d 296 (1948) ; *State v. Combs, supra.* Ordinarily, the question of whether the fingerprints could have been impressed only at the time the crime was committed is a question of fact for the jury. *State v. Miller, supra; State v. Helms, supra; see State v. Combs, supra.* It is not a question of law to be determined by the court prior to the admission of fingerprint evidence.

[3]   Defendant also contends the court erred in admitting the evidence of fingerprint identity because no "nontestimonial identification order" was obtained pursuant to Article 14 of Chapter 15A of the General Statutes (the Criminal Procedure Act) prior to the taking of defendant's fingerprints.

After defendant's arrest, he was taken to the hospital for treatment of his wound. En route to the hospital, Officer Bailey advised him of his *Miranda* rights. While in custody at the hospital, he was fingerprinted by another police officer. No attorney was present at the time and defendant was not specifically informed that he had a right to counsel during the fingerprint identification procedure.

Defendant concedes in his brief that the taking of his fingerprints by police officers does not violate the Fourth or Fifth Amendments of the United States Constitution. Rather, he argues that, absent exigent circumstances, Article 14 of Chapter 15A requires the police to first obtain a judicial order before fingerprints can be taken. G.S. 15A-271 to -282. If such an order is required, defendant maintains, under the same statute, he was entitled to have counsel present during the nontestimonial identification procedure, to be advised of this statutory

State v. Irick

right, and to be advised that an attorney would be appointed if he could not afford to retain counsel. G.S. 15A-279(d).

We believe that G.S. 15A-271 *et seq.* was not intended to apply to this defendant. Although G.S. 15A-272 clearly provides that a request for a nontestimonial identification order may be made *after* as well as prior to the arrest of a suspect, several factors lead us to the conclusion that the statute was not aimed at *in custody* defendants.

First, other provisions of the statute are inconsistent with the idea of an in custody accused. The order, outlined in the statute, requires the person named to appear at a designated time and place to submit to nontestimonial identification procedures. G.S.15A-274. This provision makes little sense as applied to one already in custody. G.S. 15A-276 provides for a possible contempt sanction in the event the person named in the order fails to appear, an unnecessary sanction for one already in custody.

The official commentary indicates the statute was designed to give North Carolina law enforcement officials a new procedure for investigating "suspects." Official Commentary, G.S. ch. 15A, art. 14 (1975). G.S. 15A-272 provides that nothing in this article "shall preclude such additional investigative procedures as are otherwise permitted by law." Elsewhere in the Criminal Procedure Act, under Article 23, we find G.S. 15A-502(a)(1) which allows the police to fingerprint a person charged with the commission of a felony or misdemeanor when he has been "[a]rrested or committed to a detention facility."

Construing these statutes so as to achieve a logical relationship and to effectuate apparent legislative intent, we hold that Article 14 of Chapter 15A applies only to suspects and accused persons before arrest, and persons formally charged and arrested, who have been released from custody pending trial. The statute does not apply to an in custody accused. Defendant in this case admits that he was in custody at the time of the fingerprinting.

The fingerprint evidence was properly admitted and all the assignments of error challenging it are overruled.

[4] In several assignments of error defendant contends the court should have granted his motion for judgment as of nonsuit in the Hipp first degree burglary case.

On a motion for nonsuit the evidence must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom. *State v. Bowden,* 290 N.C. 702, 228 S.E. 2d 414 (1976) ; *State v. Hunter,* 290 N.C. 556, 227 S.E. 2d 535 (1976) ; *State v. Covington,* 290 N.C. 313, 226 S.E. 2d 629 (1976).

The applicable test for determining the sufficiency of the evidence in a case involving circumstantial evidence was stated by Justice Lake, speaking for our Court, in *State v. Cutler,* 271 N.C. 379, 383, 156 S.E. 2d 679, 682 (1967) :

> "The test of the sufficiency of the evidence to withstand such a motion is the same whether the evidence is circumstantial, direct, or both. (Citation omitted.) 'When the motion for nonsuit calls into question the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty.' " (Citation omitted.)

On the other hand, if the evidence raises merely a suspicion or conjecture as to either the commission of the offense, or defendant's identity as perpetrator, the motion for nonsuit should be allowed. *State v. Vestal,* 278 N.C. 561, 180 S.E. 2d 755 (1971) ; *State v. Cutler, supra.*

A key piece of circumstantial evidence in this case was the fingerprint identification. A number of our cases have considered the question of sufficiency of fingerprint evidence in the context of a motion for nonsuit. *See State v. Miller, supra; State v. Jackson,* 284 N.C. 321, 200 S.E. 2d 626 (1973) ; *State v. Foster,* 282 N.C. 189, 192 S.E. 2d 320 (1972) ; *State v. Smith,* 274 N.C. 159, 161 S.E. 2d 449 (1968) ; *State v. Tew, supra; State v. Reid,* 230 N.C. 561, 53 S.E. 2d 849, *cert. denied,* 338 U.S. 876, 94 L.Ed. 537, 70 S.Ct. 138 (1949) ; *State v. Minton, supra; State v. Helms, supra.*

If the fingerprint evidence were the only evidence tending to show that the defendant perpetrated the burglary at the Hipp house, we would be hard pressed to hold that there was sufficient evidence to take the case to the jury. Fingerprint evidence, standing alone, is sufficient to withstand a motion for

nonsuit only if there is *"substantial* evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed." (Emphasis supplied.) *State v. Miller, supra; see State v. Smith, supra; State v. Minton, supra.* What constitutes substantial evidence is a question of law for the court. *State v. Miller, supra.*

Circumstances tending to show that a fingerprint lifted at the crime scene could only have been impressed at the time the crime was committed include statements by the defendant that he had never been on the premises, *e.g., State v. Miller, supra; State v. Phillips,* 15 N.C. App. 74, 189 S.E. 2d 602, *cert. denied,* 281 N.C. 762 (1972); statements by prosecuting witnesses that they had never seen the defendant before or given him permission to enter the premises, *e.g., State v. Jackson, supra; State v. Foster, supra;* fingerprints impressed in blood, *e.g., State v. Thomas,* 291 N.C. 687, 231 S.E. 2d 585 (1976) (decided this day); *State v. Phillips, supra.*

In the instant case none of the above circumstances were demonstrated. Mrs. Hipp testified only that no one had permission to enter her home *on the night in question.* Admittedly, defendant's print was found on the inside frame of the window from which the tissue box and pasteboard had been removed on the night of the burglary, but other unidentified prints were found on and around the same window. These facts do not constitute "substantial" evidence that the print could have only been impressed at the time of the alleged burglary.

In this case, however, other circumstances tend to show that defendant was the criminal actor. Defendant was observed by a police officer coming from the general direction of the Hipp home shortly after the burglary transpired; defendant had in his pocket at the time of his arrest loose bills in the same denominations and total amount as those stolen from the Hipp house; defendant was tracked by the bloodhound from the Wood home to the place where the stolen vehicle was parked (the dirty kitchen towel linked the Hipp and Wood burglaries), and defendant attempted to flee from police officers shortly after the burglaries took place.

All of these circumstances, taken with the fingerprint identification, when considered in the light most favorable to the State, permit a reasonable inference that defendant was the burglar at the Hipp house. *See State v. Reid, supra; State v.*

*Helms, supra. State v. Minton, supra,* is distinguishable because evidence in that case showed the defendant was lawfully in the store earlier on the night the crime was committed and may have left fingerprints at that time. The fact that Mrs. Hipp operated a day nursery in the room where the print was found we do not think makes her house a public place but, even assuming that it does, we do not think this circumstance is necessarily determinative. *See State v. Tew, supra* (a case involving a service station burglary in which nonsuit was held inappropriate).

We do not review here the evidence pointing to the conclusion that a burglary occurred at the Hipp home on the night in question, as we do not understand this point to be seriously in contention. The court was correct in denying defendant's motion for nonsuit and leaving the question of his guilt for the jury. This assignment of error is overruled.

[5] Defendant assigns as error the court's statement, in the presence of the jury, finding J. H. Reamy an expert in the field of fingerprint comparisons. Defendant contends the judge expressed an opinion as to the credibility of this witness contrary to G.S. 1-180. He concedes that the law in this jurisdiction does not support his contention, but asks our Court to reverse its previous rulings. *E.g., State v. King,* 287 N.C. 645, 215 S.E. 2d 540 (1975) ; *State v. Frazier,* 280 N.C. 181, 185 S.E. 2d 652 (1972).

The ruling finding this witness to be an expert in his field could not have been understood by the jury as anything other than a ruling upon the qualification of the witness to testify as to his opinions. The general practice in the courts of this State has never been for the trial judge to excuse the jury from the courtroom when ruling upon the qualification of a witness to testify as an expert. *State v. King, supra; State v. Frazier, supra; see* 1 Stansbury's N. C. Evidence, § 133 (Brandis Rev. 1973). We do not think it would serve any useful purpose to change the law to require findings on experts' qualifications to be made outside the presence of the jury and to do so would unnecessarily consume court time. Defendant is not harmed by present practice. We adhere to our former opinions and overrule the assignment of error.

Defendant next argues the court erred in giving an instruction on flight in his charge to the jury on the burglary offenses.

Defendant does not contest the form of the judge's instruction but rather the propriety of giving the instruction on flight when the evidence would support other reasonable inferences. Defendant contends the evidence of the alleged flight is equally consistent with the view that he had no knowledge of and did not participate in the burglaries, especially since defendant was operating a reportedly stolen vehicle at the time.

[6] Defendant's position is not the law in this jurisdiction. So long as there is some evidence in the record reasonably supporting the theory that defendant fled after commission of the crime charged, the instruction is properly given. The fact that there may be other reasonable explanations for defendant's conduct does not render the instruction improper. *See State v. Lampkins,* 283 N.C. 520, 196 S.E. 2d 697 (1973).

In North Carolina evidence of flight does not create a presumption of guilt but is only some evidence of guilt which may be considered with the other facts and circumstances in the case in determining guilt. *State v. Lampkins, supra; State v. Self,* 280 N.C. 665, 187 S.E. 2d 93 (1972) ; *State v. Gaines,* 260 N.C. 228, 132 S.E. 2d 485 (1963). "The wicked flee when no man pursueth, but the righteous are bold as a lion." Proverbs 28, the first verse. However, proof of flight, standing alone, is never sufficient to establish guilt. *State v. Lampkins, supra; State v. Self, supra; State v. Gaines, supra.*

[7] The evidence disclosed that the defendant came from the direction of the burglarized homes shortly after the burglaries took place. He entered and drove off in a vehicle which the police knew to be stolen. When defendant was followed by marked yellow patrol cars, he accelerated and turned into a parking lot. When his car became wedged between the police cars, he jumped from his car as it was still moving and ran away. When ordered to halt, he ignored police officers and continued to run. When the officers fired at him, he drew a pistol and returned their fire. He was subsequently found hiding in the cab of a dump truck.

One reasonable view of this evidence is that defendant fled from police after committing the burglaries. Competent evidence of flight is subject to explanation by the defendant. *State v. Lampkins, supra.* "An accused may explain admitted evidence of flight by showing other reasons for his departure

or that there, in fact, had been no departure." *State v. Lampkins, supra* at 523, 196 S.E. 2d at 698.

The instruction on flight was proper and the assignment of error is overruled.

[8] Defendant maintains the court erred in admitting testimony concerning the tracking by the bloodhound, "Snoopy," because the requirements for admissibility of bloodhound evidence, laid down by Chief Justice Stacy, speaking for our Court in *State v. McLeod*, 196 N.C. 542, 146 S.E. 409 (1929), were not met.

> "It is fully recognized in this jurisdiction that the action of bloodhounds may be received in evidence when it is properly shown: (1) that they are of pure blood, and of a stock characterized by acuteness of scent and power of discrimination; (2) that they possess these qualities, and have been accustomed and trained to pursue the human track; (3) that they have been found by experience reliable in such pursuit; (4) and that in the particular case they were put on the trial of the guilty party, which was pursued and followed under such circumstances and in such way as to afford substantial assurance, or permit a reasonable inference, of identification." *State v. McLeod, supra* at 545, 146 S.E. at 411.

The trial judge properly conducted a voir dire examination to determine the dog's "expertise." Testimony by the dog handler revealed that Snoopy was a purebred bloodhound, six years old and in good health; that he had been trained for six to eight months to pursue a human track by a man who trained dogs for the Army, and that the dog had successfully tracked missing and wanted persons at least two dozen times. When the dog's services were not so required, his handler kept him in practice by laying a track and having Snoopy trail the person. Snoopy had participated in fifty to seventy-five such practice runs.

These facts amply supported the trial court's findings as to Snoopy's pedigree, training, and experience—requisites (1), (2) and (3) as set out in *McLeod, supra*. If defendant is concerned that Mr. Overcash's testimony was not entirely based on personal knowledge, in particular the testimony related to

Snoopy's training, he should have objected on the grounds of hearsay.

In a case where the purity of a bloodhound's bloodline was attacked, Justice Sharp (now Chief Justice) noted:

"In practice, if the dog has been identified as a bloodhound, it has been the *conduct* of the hound and other attendant circumstances, rather than the dog's family tree, which have determined the admissibility of his evidence." *State v. Rowland,* 263 N.C. 353, 359, 139 S.E. 2d 661, 665 (1965). (Emphasis added.)

The same practical approach can be extended to challenges to a bloodhound's formal training where experience has shown him to be reliable. Just as "proof of the pudding is in the eating," proof of the bloodhound is in the tracking. Miguel De Cervantes, *Don Quixote,* Part 1, Book IV, Chapter 10, Page 322. Snoopy's performance record was excellent and within the personal knowledge of the witness.

Defendant also claims that *McLeod's* fourth requisite was not established. In the present case the bloodhound was taken to the spot where defendant was last seen before disappearing into the used car lot. The dog quickly picked up a scent and followed it to the fence surrounding the used truck lot. A police search inside the fence found defendant hiding in a dump truck. Later, Snoopy was taken to the Wood home to see if he could pick up a scent. He followed a track, beginning under the dining room window, which eventually led to the Phillips 66 Station, the spot where defendant climbed into the green Dodge.

Defendant asserts that the tracking was suspect because the dog was not exposed to an article carrying defendant's scent before the tracking began. This is not a required procedure. At the used car lot, it was sufficient to take Snoopy to the place where defendant had last been observed. At the Wood home, the dog necessarily began with a blind scent because, at the time, the police had no suspects in the Wood burglary. Where the guilty party is unknown, it is sufficient if the dog is laid on the trail "at a point where the circumstances tend clearly to show that the guilty party has been . . ." *State v. Norman,* 153 N.C. 591, 593, 68 S.E. 917, 918 (1910).

The dog handler testified that, in good weather, the dog was capable of picking up a scent for up to four hours. On the

evening in question, the dog first picked up a scent at 3 a.m., thus the tracks could not have been made earlier than 11 p.m. Mr. Overcash admitted on voir dire that if someone else had left a trail around the same time as the guilty party he could not say whether the dog tracked the other person or the culprit. Given all the circumstances, including the very late hour, we believe it highly unlikely that the track from the dining room window could have been left by anyone other than the burglar.

The fact that the bloodhound tracking showed a path from the Wood home directly to the Phillips 66 Station while the State's other evidence, the dirty kitchen towel, indicated a detour by way of the Hipp home, does not render the bloodhound evidence inadmissible. Mr. Overcash stated that the dog became confused while on the track and that it was necessary to work the dog around another house in the neighborhood before the dog picked up the scent again and followed it to the service station. The relative locations (as depicted in the aerial photograph) of the house where the dog became confused, the Hipp house, the Wood house and the service station were such that one could reasonably infer the guilty party took a side trip beginning at the house where Snoopy became confused to the Hipp house and back before returning to the service station.

Although Snoopy never bayed the defendant, the bloodhound evidence was competent. To be admissible bloodhound evidence does not have to result in a positive identification. So long as a reasonable inference as to defendant's guilt arises on the facts, the evidence is for the jury.

The assignment of error is overruled.

[9] While Officers Shaw, Bailey and Patton had the green Dodge under surveillance at the Phillips 66 Station, Officer Patton radioed to Officer Shaw that he observed a subject coming from behind the Phillips 66 Station and approaching the suspect vehicle. The next dispatch from Patton to Shaw indicated that the subject was getting into the vehicle (green Dodge). Officer Shaw was permitted to testify to the substance of these dispatches over a general objection by the defendant.

Defendant now contends the testimony was hearsay and consequently his general objection and motion to strike should have been allowed. We believe this testimony was admissible for two reasons.

"If a statement is offered for any purpose other than that of proving the truth of the matter stated, it is not objectionable as hearsay."

\* \* \*

"The declarations of one person are frequently admitted to evidence a particular state of mind of another person who heard or read them . . . to explain his subsequent conduct." 1 Stansbury's N. C. Evidence, § 141 (Brandis Rev. 1973) at 467-71.

The officers were positioned on two sides of the Phillips 66 Station. Officer Shaw was located at a place where he could watch the vehicle but could not see the back of the Phillips 66 Station. He testified that, before assuming his position, he radioed Officer Patton to notify him if anyone entered or came close to the vehicle. Officer Patton's dispatches were offered to explain Officers Shaw and Bailey's subsequent conduct in pursuing the suspect vehicle and were admissible for this limited purpose. The statements were not offered to establish the truth of any matter asserted by Officer Patton. *See State v. Black,* 230 N.C. 448, 53 S.E. 2d 443 (1949) ; *State v. Shadding,* 17 N.C. App. 279, 194 S.E. 2d 55, *cert. denied,* 283 N.C. 108 (1973).

The statements are also admissible as part of the *res gestae.* The words of the radio dispatch accompanied and were connected with the series of events culminating in defendant's capture.

"[T]he res gestae phrase is used to describe situations in which words accompany and are connected with the non-verbal conduct or external events, and carries the general idea of something said while something is happening or being done." 1 Stansbury's N. C. Evidence, § 158 (Brandis Rev. 1973). *See State v. Hunt,* 289 N.C. 403, 222 S.E. 2d 234 (1976).

The assignment of error is overruled.

[10] In his next assignment of error, defendant contends the court erred in permitting Mrs. Hipp to testify concerning the contents of her husband's billfold. After a preliminary question

to which the court sustained objection, the following questions and answers appear in the record:

> "Q. When you and your husband went to bed the night before state what, if anything, was in your husband's billfold.
>
> "MR. AUSTIN: Objection.
>
> "COURT: Do you know what was in your husband's billfold the night before, did you see what was in it?
>
> "A. Yes.
>
> "COURT: Overruled.
>
> "Q. What was it?
>
> "A. Money.
>
> "Q. Do you know how much money your husband had in his billfold the night before when you went to bed?
>
> "A. $60.00."

This testimony was not hearsay as it affirmatively appears the witness was testifying from her own knowledge. The probative force of the testimony depended on Mrs. Hipp's own competency and credibility. The discrepancies in her testimony, noted by defendant's counsel, went to her credibility. *See* 1 Stansbury's N. C. Evidence, § 138 (Brandis Rev. 1973).

The assignment of error is meritless and overruled.

[11]  In several assignments of error, defendant argues that the assault charges should have been nonsuited and that the instructions on assault were erroneous.

G.S. 14-34.2 provides as follows:

> "Any person who shall commit an assault with a firearm upon any law enforcement officer or fireman while such officer or fireman is in the performance of his duties shall be guilty of a felony . . .."

Defendant contends there was insufficient evidence to show (1) that the defendant knew the police were performing official duties and (2) that the police were in fact performing such duties and thus, his motion for nonsuit should have been allowed.

The State's evidence on these points tends to show the following: A green Dodge had been reported missing from Moore's Park a short time before 6 January and had not been reported as found. Officer Shaw had been on the lookout for the car and was suspicious when he spotted a similar automobile early on the morning of 7 January. Several officers, including Shaw and Bailey, kept the car under surveillance after the car was identified as the stolen vehicle. These policemen were in uniform and driving marked, bright yellow police cars. When a person entered the green Dodge and drove away, Officers Shaw and Bailey gave pursuit. The headlights of the police cars and the green Dodge were on. The street was fairly well lighted. As the officers followed the green Dodge, it accelerated and turned abruptly into a parking lot. Officers Shaw and Bailey tried to block the suspect car in the parking lot. A three-car collision resulted. At the time of the collision, the police and the defendant were about one car width apart. Defendant was sitting in the middle of the front seat, steering with his left hand. After the collision, he jumped from the green Dodge before it stopped moving and began to run. Officer Shaw got out of his patrol car and called to the defendant to halt. He could see defendant's face and clothes, as could Officer Bailey. When defendant continued to run, Officer Shaw fired at him. Officer Bailey pursued the defendant on foot. The defendant pulled a pistol and fired in the general direction of both officers. Officer Bailey returned the fire.

When viewed in the light most favorable to the State, the evidence warrants the inference that defendant could see the officers' cars and their clothing and could hear the instruction to halt, and thus must have known his assailants were police officers in the performance of their duties. These circumstances enumerated above further tend to show that the policemen were in fact in the performance of their duties.

Defendant argues that the officers, in using deadly force to effectuate his arrest, were in excess of their statutory authority outlined in G.S. 15A-401(d)(2), and thus could not be within the performance of their duties as required for a conviction under G.S. 14-34.2. This is an interesting but, we believe, dangerous proposition. It would allow a fleeing accused felon to fire with impunity at police officers who are attempting an otherwise lawful arrest.

Our examination of G.S. 15A-401 (d) (2) and prior case law lead us to the conclusion that the statute was designed solely to codify and clarify those situations in which a police officer may use deadly force without fear of incurring criminal or civil liability. *See Perry v. Gibson,* 247 N.C. 212, 100 S.E. 2d 341 (1957) ; *Sossamon v. Cruse,* 133 N.C. 470, 45 S.E. 757 (1903) ; G.S. 15A-401 (d) (2). *See also* Corbett, *Criminal Process and Arrest under the North Carolina Pretrial Criminal Procedure Act of 1974,* 10 Wake Forest L. Rev. 377, 399, 408, 413 (1974).

[12] We hold that while the use of excessive force in a lawful arrest may subject a law enforcement officer to civil or criminal liability, it does not take the officer outside the performance of his duties for purposes of G.S. 14-34.2. We do not reach the issues of whether Officers Shaw and Bailey used deadly force in this case, and whether, assuming they did, they would be liable for using force in excess of that authorized by the Criminal Procedure Act.

Defendant complains about the trial court's instruction that, "[t]he attempt to arrest a person driving a stolen vehicle is a duty of his [the policeman's] office." Defendant contends this instruction took an issue away from the jury. We do not agree. Under G.S. 14-71 and 14-72 the possession of a vehicle known to be stolen would be a crime. The arrest of a person who the police have probable cause to believe has committed the crime is certainly an official duty of the police. The issue of whether the officers were in the performance of their duties was not withdrawn from the jury's consideration in this case. In order to convict the defendant, the jury had to find that the officers were in fact attempting to arrest the defendant for intentionally driving a stolen vehicle.

[13] Defendant further contends the court's instruction was erroneous because the judge did not charge on any lesser included offenses, specifically, assault by pointing a gun, assault on a law enforcement officer in the performance of his duties, and simple assault. *See* G.S. 14-33 (a) and (b), G.S. 14-34.

Defendant's objection is not well taken. The correct rule requires the trial judge to charge on a lesser included offense when and only when there is evidence which would support a conviction of the lesser crime. The presence of such evidence is the determinative factor. *State v. Bryant,* 280 N.C. 551, 187

S.E. 2d 111, *cert. denied,* 409 U.S. 995, 34 L.Ed. 2d 259, 93 S.Ct. 328 (1972); *State v. Carnes,* 279 N.C. 549, 184 S.E. 2d 235 (1971).

All the evidence tended to show that defendant pulled a gun from his waistband and fired at Officers Shaw and Bailey who were attempting to arrest him for possession of a stolen vehicle. There was no evidence of any lesser offenses. *State v. Thacker,* 281 N.C. 447, 189 N.C. 2d 145 (1972), cited to us by defendant, is distinguishable because the crime charged (assault with a deadly weapon with intent to kill inflicting serious injury) was a specific intent crime. *See State v. Harris,* 290 N.C. 718, 228 S.E. 2d 424 (1976); *State v. Thacker, supra.*

All assignments of error relating to the motion for nonsuit and the instructions to the jury on the assault charges are overruled.

[14] Defendant maintains that the act of firing the gun four times resulted in only one assault, not two, and that the court erred in imposing consecutive prison sentences for the two assault convictions. Defendant argues that unless the two assault convictions are merged and one judgment imposed, he has received double punishment for the same offense in violation of Article I, Section 19 of the North Carolina Constitution and Articles V and XIV of the United States Constitution, which guard against double jeopardy. The constitutional principle of double jeopardy is designed to protect an accused from double punishment as well as double trials for the same offense. *Ex parte Lange,* 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873).

The applicable double jeopardy test in this case is the "same evidence test" which asks two questions. First, "[w]hether the facts alleged in the second indictment if given in evidence would have sustained a conviction under the first indictment." *State v. Hicks,* 233 N.C. 511, 516, 64 S.E. 2d 871, 875, *cert. denied,* 342 U.S. 831, 96 L.Ed. 629, 72 S.Ct. 56 (1951); *accord, State v. Ballard,* 280 N.C. 479, 186 S.E. 2d 372 (1972). The answer to this question is determined by an examination of the two indictments. *State v. Hicks, supra.* In the present case, the second indictment does not mention Officer Shaw. Thus, even if all the facts alleged therein were proven, they would not support a conviction for an assault on Officer Shaw.

The second question posed by the "same evidence test" asks "whether the same evidence would support a conviction in each

case" and looks at facts *dehors* the indictments. *State v. Hicks, supra* at 516, 64 S.E. 2d at 875; *accord, State v. Ballard, supra.* Defendant fares no better under this portion of the test. The evidence necessary to show that Officer Shaw was a law enforcement officer performing his duties is not the same evidence as is required to show that Officer Bailey was a law enforcement officer functioning in an official capacity. We hold that defendant's act in firing the gun at two officers constituted two assaults. Imposition of two sentences was proper and the assignment of error is overruled.

[15]   Finally, defendant complains (1) that prospective jurors should have been informed of the punishment for first degree burglary prior to their selection; (2) that defense counsel should have been permitted to tell the jury in his final argument that the law prescribed mandatory life imprisonment for first degree burglary, and (3) that the court should have advised the jury of the mandatory life sentence in its final charge. Defense counsel properly moved the court that each of the above be done. The assistant district attorney stated that he had no objection to defendant's motions. Later, counsel for defendant renewed his request, in writing, that the court advise the jury of the penalty. All of these motions were denied.

Defendant relies upon *State v. McMorris*, 290 N.C. 286, 225 S.E. 2d 553 (1976). In that case we held it was error for the court to deny defense counsel the opportunity to inform the jury that conviction would necessarily result in imposition of a life sentence. That decision was based on G.S. 84-14, the last sentence of which reads as follows:

"In jury trials the whole case as well of law as of fact may be argued to the jury." *See State v. Miller*, 75 N.C. 73 (1876).

Justice Exum, in *McMorris, supra,* detailed the history of the problem which now confronts us. He concluded that, "[i]t is proper for defendant to advise the jury of the possible consequence of imprisonment following conviction to encourage the jury to give the matter its close attention and to decide it only after due and careful consideration." *State v. McMorris, supra* at 288, 225 S.E. 2d at 554.

*McMorris* also cited as authority *State v. Britt*, 285 N.C. 256, 204 S.E. 2d 817 (1974), a capital case in which Justice

State v. Irick

Branch outlined the permissible bounds of jury argument as follows:

"Counsel may, in his argument to the jury, in any case, read or state to the jury a statute or other rule of law relevant to such case, including the statutory provision fixing the punishment for the offense charged. (Citations omitted.) He may not, however, state the law incorrectly or read to the jury a statutory provision which has been declared unconstitutional. (Citations omitted.) Nor may counsel argue to the jury that the law ought to be otherwise, that the punishment provided thereby is too severe and, therefore, the jury should find the defendant not guilty of the offense charged but should find him guilty of a lesser offense or acquit him entirely." *State v. Britt, supra* at 273, 204 S.E. 2d at 829.

G.S. 15-176.5 specifically provides that counsel in a *capital* case may in his argument to the jury indicate the consequences of a guilty verdict. In addition, G.S. 15-176.4 provides that the court shall, upon request, advise the jury of the death penalty. The legislature has not addressed the issue of the trial court's duty to advise the jury in a non-capital case of the punishment. As indicated by *McMorris,* "[w]hether the trial judge should tell the jury in a proper case that upon conviction a mandatory life sentence will be imposed is still an open question. It could hardly be error to do so." *State v. McMorris, supra* at 291, 225 S.E. 2d at 556.

Assuming counsel is permitted to tell the jury that the defendant will receive a mandatory life sentence upon conviction, we cannot perceive of any prejudice resulting to the defendant if the trial judge does not repeat the penalty in his final instruction. Thus, the reversible error of Judge Barbee was failing to permit defense counsel to state the mandatory punishment for first degree burglary in his final jury argument. Had this been permitted, no prejudicial error could have resulted from the court's refusal to instruct the jury on the sentence. Our decision today is no reflection on Judge Barbee because the controlling case, *McMorris,* was not filed until three days after he denied defendant's motions.

Defendant fails to suggest any rationale for requiring the trial judge to inform prospective jurors on voir dire of the sentence in a non-capital case. Nor can we conceive of any basis

for such a rule. Judge Barbee correctly denied this motion. See G.S. 15-176.3 for the rule in a capital case.

For the reasons set out above, defendant is entitled to a new trial on the first degree burglary charge. We find no error in the two assault convictions.

In 76CR2984 (burglary)—New trial.

In 76CR2986 (assault on a law enforcement officer with a firearm)—No error.

In 76CR2987 (assault on a law enforcement officer with a firearm)—No error.