IN THE COURT OF APPEALS OF NORTH CAROLINA

2021-NCCOA-19

No. COA19-615

Filed 16 February 2021

Wake County, No. 16 CRS 202713

STATE OF NORTH CAROLINA

v.

MAJOR EARL EDWARDS, JR.

Appeal by defendant from judgment entered 15 May 2018 by Judge Michael

O'Foghludha in Wake County Superior Court. Heard in the Court of Appeals 22

September 2020.

*Attorney General Joshua H. Stein, by Deputy General Counsel Blake W. Thomas, for the State.*

*Glover & Petersen, P.A., by James R. Glover, for defendant.*

DIETZ, Judge.

Defendant Major Earl Edwards, Jr. appeals his conviction for first degree

felony murder. Edwards argues that the trial court erred by declining his request for

an instruction on lack of flight.

As explained below, the trial court properly declined to give that instruction

based on the evidence at trial. Moreover, even assuming the trial court erred, the

overwhelming evidence of Edwards's guilt rendered that error harmless. We

therefore find no error in the trial court's judgment.

**Facts and Procedural History**

¶ 3          In 2016, Amigo Taxi cab driver Jose Dominguez responded to a call for a taxi at an apartment complex in Raleigh. A man got into the cab, shot Dominguez in the head, dragged him out of the cab, and then robbed him as he lay dead on the ground.

¶ 4          In the days leading up to the murder of Jose Dominguez, Defendant Major Earl Edwards, Jr. texted with another man, Conrad Patterson, and described obtaining a handgun. Edwards later texted Patterson explaining that "I got to make a move to keep my lights or they going to be cut off tomorrow at 10:00."

¶ 5          Cell tower location data showed that Edwards and Patterson traveled from Edwards's hometown of Louisburg to Raleigh on the night of the murder. Late that night, at 12:56 a.m., Edwards's phone was used to look up the webpage for Amigo Taxi. At 1:04 a.m., Edwards's phone made a 31-second call to Amigo Taxi. At 1:05 a.m., Amigo Taxi dispatched Jose Dominguez to respond to that call at the pick-up location, a Raleigh apartment complex. One of Edwards's relatives also lived at that apartment complex.

¶ 6          During the time period when the cab was on its way to the apartments, Edwards and Patterson again exchanged text messages. At 1:14 a.m., Edwards texted Patterson that he was "at the building to your right." At 1:16 a.m., Patterson texted Edwards telling him to "delete all the messages out your phone that you sent to me,

your girl, or anybody just in case."

Surveillance footage showed Dominguez's taxicab reach the apartment complex shortly after. As the cab slowly drove through the complex, Dominguez called Edwards's cell phone in a call that lasted 36 seconds.

Several witnesses saw the next series of events. First, Ray Jackson, who was visiting his girlfriend's residence at the apartment complex, heard a gunshot and saw a flash from within the passenger area of the taxicab. Jackson then saw the shooter get out of the back seat of the car and fire into the front of the cab. The shooter also reached into the cab, took off Dominguez's seat belt, and dragged him out of the car.

Around the same time, another witness, Eric Garrett, drove into the apartment complex and saw an "altercation" happening at the taxicab. Both witnesses saw the shooter rummaging through Dominguez's pockets as he lay on the ground with gunshot wounds. The shooter then saw Garrett and fired three times at Garrett but missed. Garrett and Jackson saw the shooter run to a white car and get in. Surveillance video from this same time period showed a white, four-door car leaving the apartment complex.

Law enforcement and emergency personnel responded, but Dominguez already had died of his wounds at the scene, which included two gunshot wounds to the head. Investigating officers found a sweatshirt on the rear left floorboard of the taxicab. The sweatshirt had a cell phone in it. It was the prepaid cell phone that Edwards

used to communicate with Patterson. The phone also had photos connecting it to Edwards, including photos of Edwards, his State-issued identification card, and his electric bill. The phone also had a fingerprint on it that matched Edwards's prints.

¶ 11 Officers went to Edwards's home and found Edwards, Patterson, and another man near a white, four-door car resembling the one in the surveillance footage from the crime scene. The officers asked the men if they were willing to come to the station for questioning. The men agreed and drove the white car to the police station themselves.

¶ 12 The white car belonged to Patterson's girlfriend, and she gave law enforcement officers consent to search it. The search uncovered blood matching Dominguez's DNA on the front passenger armrest and shards of broken glass that matched the glass from Dominguez's taxicab window. Investigators also found bloody clothes in a trash bin near Edwards's home. The blood on those clothes was consistent with Dominguez's blood sample. The bloody clothes included a gray sweater resembling one Edwards was seen wearing in surveillance footage on the day of the murder.

¶ 13 Edwards was indicted for first degree murder. The State presented the evidence described above. Edwards offered no evidence at the trial. Before the jury charge, Edwards requested an instruction on flight that permitted the jury to infer "innocence or a lack of guilt" from Edwards's decision not to flee when investigators approached him at his home. The trial court declined to provide the requested

instruction. The jury found Edwards guilty of first degree felony murder. The trial

court sentenced Edwards to life in prison without parole. Edwards appealed.

**Analysis**

¶ 14    Edwards argues that the trial court erred by rejecting his proposed jury

instruction addressing lack of flight. Ordinarily, when a defendant requests specific

jury instructions, the trial court "must give the instructions requested, at least in

substance, if they are proper and supported by the evidence." *State v. Edwards*, 239

N.C. App. 391, 392, 768 S.E.2d 619, 620 (2015). On appeal, we review *de novo* whether

the evidence supported the requested instruction. *Id.* at 393, 768 S.E.2d at 621.

¶ 15    Here, Edwards requested the following jury instruction concerning flight:

> **Proposed Jury Instruction—Lack of Flight**
>
> The evidence shows that the defendant did not flee.
> Evidence of flight may be considered to show a
> consciousness of guilt. Evidence of lack of flight may be
> considered by you together with all other facts and
> circumstances in this case in determining whether the
> combined circumstances amount to a showing of innocence
> or a lack of guilt.

The trial court declined to give this requested instruction.

¶ 16    There are several fatal flaws in Edwards's argument with respect to this

proposed instruction. As an initial matter, the instruction is not directed at Edwards's

actions at the crime scene. To the contrary, uncontested evidence indicates that the

shooter—a man the State alleged was Edwards—fled the scene in a white car after

murdering Dominguez. It was only later, when investigators identified Edwards as a suspect, that they went to his home to question him and, at that time, he did not flee but instead cooperated with the investigation.

¶ 17    There are a number of cases from our Supreme Court indicating that, in this context, an instruction on lack of flight is inappropriate because it would permit defendants "to make evidence for themselves by their subsequent acts." *State v. Burr*, 341 N.C. 263, 297, 461 S.E.2d 602, 620 (1995). Thus, the "general rule is that the defendant in a criminal case is not, for the purpose of showing his innocence, allowed to prove that he refused to take to flight before his arrest or to escape from jail after his arrest." *Id.* Accordingly, the trial court did not err by declining to provide the requested instruction.

¶ 18    In any event, even assuming the trial court erred by refusing to give the requested instruction, that error was harmless. An error at trial is harmless "unless there is a reasonable possibility that, had the error in question not been committed, a different result would have been reached at trial." *State v. Babich*, 252 N.C. App. 165, 172, 797 S.E.2d 359, 364 (2017). As explained in the recitation of facts above, the State had overwhelming evidence showing Edwards murdered Dominguez in a botched robbery, including witness testimony; surveillance footage; DNA, blood, and fingerprint analysis; and Edwards's own statements in text messages on the cell phone he left at the crime scene. In light of all this evidence, there is no reasonable

possibility that, had the court given the requested instruction on lack of flight, the jury would have reached a different result. *Id.* Accordingly, even if the trial court's failure to instruct on lack of flight was error, that error was harmless and could not result in reversal of the trial court's judgment.

## Conclusion

We find no error in the trial court's judgment.

NO ERROR.

Judge TYSON concurs.

Judge MURPHY concurs in part and concurs in result only in part with separate opinion.

MURPHY, Judge, concurring in part and concurring in result only in part.

¶ 20          I concur in the portion of the Majority which properly summarizes the current status of the law that an instruction on lack of flight is unavailable to Defendant.[1] However, in writing separately, and of little solace to Defendant, I agree that if we are going to continue to instruct jurors on flight, the opposite instruction must also be available to a defendant who does not flee. *See State v. Thorne*, No. COA19-159, 267 N.C. App. 692, 833 S.E.2d 254, 2019 WL 4803677, *2 n.1 (2019) (unpublished), *review denied*, 373 N.C. 590, 837 S.E.2d 896 (2020); *State v. Ellis*, No. COA19-820, 848 S.E.2d 756, 2020 WL 6140639, (N.C. Ct. App. 2020) (unpublished).

¶ 21          As Defendant accurately observes in his brief, whether appropriate or not in our secular system, the principles underlying the flight instruction derive from Proverbs, "[t]he wicked flee when no one pursues, but the righteous are bold as a lion." Proverbs 28:1 (English Standard Version); *See State v. Irick*, 291 N.C. 480, 494, 231 S.E.2d 833, 842 (1977); *State v. Dickerson*, 189 N.C. 327, 331, 127 S.E. 256, 258

---

[1] Note that the law as correctly stated by the Majority in its citation to *Burr*, *supra* at ¶ 17, traces back to an 1868 decision by our Supreme Court, which begins:

> It is no ground to quash an indictment, that it was found by a grand jury drawn from a *venire* in which there were no colored freeholders--the jury list, as constituted by the county court in accordance with the law in force at the time of its constitution, not contai[ni]ng the names of such colored freeholders.

*State v. Taylor*, 61 N.C. 508, 508 (1868). To suggest it is time for our Supreme Court to revisit the application of and reference to such an outdated case and one-sided application of jury instructions is self-evident.

(1925). Flight is either important for the jury's consideration of the evidence of Defendant's guilt, or it is not.[2]

As we are bound by caselaw to reject Defendant's argument as to the availability of his requested instruction, I concur in the analysis and result reached by the Majority. However, I do not join in the Majority's harmless error analysis as I would find such consideration to be moot.

---

[2] I would also point out that the availability of an instruction that helps carry the burden of only one party in a criminal prosecution is itself constitutionally questionable. However, no such arguments have been raised at any point in this action and are not before us in this appeal.