STATE OF NORTH CAROLINA v. HARVEY HILLARD BLAKE, SR.

No. 155A85

(Filed 12 August 1986)

**1. Homicide § 15— evidentiary rulings—no error**

There was no error in the trial judge's evidentiary rulings in a first degree murder prosecution where there was no abuse of discretion in the judge's rulings on leading questions; evidence of defendant's flight was relevant; items of hearsay were used for corroborative purposes or to explain actions rather than for substantive purposes; and the admission of lead fragments taken from the victim's body and an in-court identification of defendant as being at the scene of the shooting were inconsequential because defendant admitted being involved in the altercation which led to the victim's death and that the victim was shot with his gun.

2. **Homicide § 30.2— first degree murder—failure to instruct on voluntary manslaughter—no error**

   The trial court did not err in a prosecution for first degree murder by failing to submit voluntary manslaughter as a possible verdict where the State's evidence tended to show a cold, calculated premeditated shooting by defendant and defendant's evidence tended to show that he did not shoot the victim intentionally and never intended to harm him.

3. **Homicide § 23— first degree murder—no error in instructions**

   The trial court did not err in its instructions to the jury in a first degree murder prosecution where the judge fully and accurately instructed on the doctrine of misadventure and accident; there was no error in introducing a summary of the evidence by the use of the phrase "tends to show"; not guilty was submitted as an alternative verdict; and the judge's statement of the State's burden during the self-defense instruction was a *lapsus linguae* which was immediately rectified and from which there could have been no prejudice since it applied only to involuntary manslaughter and the jury returned a verdict of murder in the first degree.

4. **Homicide § 23— first degree murder—failure to adopt proffered jury instructions—no error**

   The trial court did not err in a first degree murder prosecution by failing to adopt twenty-one of defendant's proffered jury instructions.

APPEAL by Defendant pursuant to N.C.G.S. § 7A-27(a) from a life sentence imposed by *DeRamus, J.,* presiding at the 29 October 1984 Session of GUILFORD County Superior Court, after a jury trial at which defendant was convicted of first degree murder.

*Lacy H. Thornburg, Attorney General, by James J. Coman, Special Deputy Attorney General, and Joan H. Byers, Assistant Attorney General, for the state.*

*Robert S. Cahoon for defendant appellant.*

EXUM, Justice.

This appeal presents questions having to do with the admissibility of certain evidence and the correctness of certain jury instructions. We find no merit to any of defendant's arguments. There is no reversible error in the trial.

I.

Defendant was indicted by the Guilford County Grand Jury on 7 July 1980 for first degree murder in the 25 August 1979 homicide of Louie Garcia Flores. Defendant fled the jurisdiction

the day of the killing and was arrested on a fugitive warrant on 8 January 1981. Defendant resisted extradition but finally was returned to North Carolina on 26 September 1983. The trial court, after a *Watson* hearing held at the state's instance, determined there were no aggravating circumstances and ruled the case be tried as a noncapital, first degree murder case.[1]

## A.

The state presented evidence tending to show: The victim, Louie Garcia Flores (Flores), operated an automobile body shop in Greensboro. In the early evening of 25 August 1979, Flores was working in his shop on the vehicle of a customer, John Mandikos. Karen Blake, defendant's daughter and Flores' fiancee, arrived at the shop with her stepmother Hallie Blake, defendant's wife. The two women came to pick up a car Flores had repaired for Mrs. Blake's daughter from a previous marriage. Mrs. Blake argued with Flores about the price he charged and, upon returning home, informed her husband, defendant, of the dispute and sent him to Flores' shop to straighten it out.

Meanwhile several customers, including John Mandikos, Mr. and Mrs. Marshall Lancaster, and Steve Mannis had arrived at Flores' body shop to watch or assist Flores. The entire group was standing in or near the open garage door when a pickup truck pulled into the parking lot and screeched to a halt with its horn sounding. When he saw the truck, Flores, who was unarmed, put down his tools and walked outside to speak to the driver, the defendant herein, who remained in the truck. Defendant raised his voice and addressed Flores argumentatively. Defendant, still sitting in the truck cab, fired a gun once into the air. Flores froze about three feet from the truck. Defendant said, "The next shot will be for real." He held the gun next to Flores' right eyelid and shot Flores at point-blank range.

After the first shot the customers scattered and ran for cover. Defendant left in his truck after firing the second shot.

---

1. In *State v. Watson*, 310 N.C. 384, 388, 312 S.E. 2d 448, 452 (1984), the Court commended "for its judicial economy and administrative efficiency" a pretrial hearing in a potential capital case at which the trial court would determine whether there was any evidence of any of the aggravating factors defined by N.C.G.S. § 15A-2000(e). If not, the trial court could order that the case be tried as a first degree murder, noncapital case.

Lancaster, one of the customers, emerged from the shop, saw Flores lying on the ground bleeding from the nose, mouth and ear, and ran across the street to summon the police and an ambulance. Flores was declared dead shortly after his arrival at a local hospital, never having regained consciousness. Dr. Page Hudson, Chief Medical Examiner for the State of North Carolina, found no powder burns on Flores' face, leading him to conclude the gun's muzzle was against the victim's eyelid when fired. The gunshot wound to the head and the resulting brain damage proximately caused Flores' death.

Witnesses told the first Greensboro police officer who arrived at the scene, C. E. Bryant, that the man who shot Flores was a white male with the surname Blake and drove a light gray Ford pickup truck with a camper on the back. Greensboro police obtained an arrest warrant for defendant and searched in vain for him until January 1981, when officers learned he was working as a brickmason in Dallas, Texas. On 8 January 1981 Dallas police investigators in the fugitive unit, who knew from their Crime Stoppers unit that defendant was wanted for murder in North Carolina, informed Greensboro detectives they had Blake in custody in Texas. Dallas detectives had arrested defendant at the Denton County construction site where he worked under the name Jay Chandler but soon discovered by comparing photographs and fingerprints that he was Harvey Hillard Blake, Sr. Nevertheless, detectives found several types of identification on defendant's person, including a Florida driver's license, a California minister's license, a fishing license, and two Social Security cards with different numbers, all issued to either James D. or Jay D. Williams or Jay Chandler. Blake did not admit his true identity until detectives told him they had confirmed it through fingerprint comparison. Defendant then volunteered to Detectives Becerra and Parker "all that was back in North Carolina, my daughter is sixteen years old, got pregnant by a black man, and I went down to talk to him about it, the man reached in the pickup for a rifle, and I had to shoot him." Flores was in fact Hispanic, and Blake's daughter was in fact 22 years old in 1979. Blake was not returned to this jurisdiction from Texas until September 1983 due to his resistance to extradition.

## B.

Defendant's own testimony tended to show: He had met Flores, who had been dating Blake's daughter Karen, about one year before Flores' death. Flores was to have married Karen Blake within a few days of 25 August 1979. Blake did not approve of the couple's lifestyle, notably their drug use and cohabitation and pregnancy out of wedlock, which he blamed on Flores. Nonetheless, Blake sought to get along with his future son-in-law.

When Mrs. Blake told defendant that Flores said he should come discuss the dispute over the bill, defendant finished some brickwork he was doing at his house, showered, and drove calmly to Flores' body shop. He pulled in to the shop slowly and blew the horn. When Flores came out to the truck, defendant accused him of lying about the repair estimate. Flores, who was unarmed, grabbed defendant by the throat and started choking him. Defendant, who was then 50 years old and had heart trouble, started having chest pains and reached beside him on the seat for his small .22 caliber pistol, which he kept there fully loaded at all times. Defendant never put his finger on the trigger, never pointed the gun at Flores, and never intended to harm him. He merely intended to show it to Flores so Flores would stop choking him. Flores, who had his head, arms and part of his torso in the truck's cab, grabbed the gun, which fired first through the passenger window. Immediately, while defendant still had his hand on the gun, Flores jerked the gun towards himself and it fired a second shot. Flores fell to the ground, and the gun fell back inside the truck in defendant's lap. Defendant panicked, drove away and threw his gun out the window on a nearby street. He drove to Charlotte and called his wife from a pay phone. She informed him that the police wanted him for Flores' murder.

Defendant then fled to Florida, Texas, California and Mexico over the next sixteen months, supporting himself by pursuing his occupation, brickmasonry. During these travels the passenger window of defendant's truck, immediately shattered by the first bullet, fell out and was replaced in Texas. Investigators did not find any broken glass at the scene of the shooting. Defendant admitted he remained a fugitive, changed his appearance, used aliases, and obtained a stolen birth certificate and false identification because he was scared. Defendant also paid $15 for a minis-

ter's license in an assumed name from the Universal Life Church. When first arrested, defendant denied he was Harvey Blake until confronted with evidence of matching fingerprints. At trial defendant denied, however, that he told Detectives Becerra and Parker anything about the events of 25 August 1979 in Greensboro.

## C.

The trial judge instructed the jury they could find defendant guilty of murder in the first or second degree or involuntary manslaughter. Judge DeRamus also instructed them they could find defendant not guilty, and explained the concepts of flight, accident, burden of proof, reasonable doubt, and jurors' duties. He also summarized the evidence presented by both sides, reminding the jury they were to be guided by their own recollections and not his. The jury unanimously found defendant guilty of first degree murder, upon which Judge DeRamus entered the mandatory judgment of life imprisonment, as the case was tried as a noncapital case.

## II.

[1] Defendant assigns error to the admission of a number of items of evidence. There is little argument and no citation of pertinent authority to support defendant's contentions as to admissibility. Most of this part of defendant's brief is simply a reproduction of the transcript where the alleged errors occurred. Defendant complains of (1) use by the prosecutor of leading questions; (2) unresponsive answers; (3) gratuitous condemnation of defendant by an eyewitness who said at the time of the shooting that defendant "looked like the devil, he was so mad"; (4) use of irrelevant evidence; (5) use of hearsay evidence; (6) lack of a proper foundation for certain business records; (7) lack of a chain of custody; and (8) an improper in-court identification of defendant.

We find no merit to any of defendant's arguments. It would serve no useful purpose to discuss in detail each item of evidence and to demonstrate why there was no error or if there was error, why it could not have affected the outcome of the trial.

We can summarily deal with these questions as follows: Rulings on questions arguably leading rest in the trial court's discretion and will not be disturbed in the absence of an abuse of discretion. *State v. Young*, 312 N.C. 669, 325 S.E. 2d 181 (1985).

Nothing in the rulings complained of here even approach an abuse of discretion. An eyewitness's testimony that defendant was so mad he looked like the devil probably should have been stricken on defendant's motion as unresponsive to the question put, but we are satisfied this error had no effect on the trial's outcome. Evidence of defendant's flight was not, as defendant seems to contend, irrelevant. *State v. Irick*, 291 N.C. 480, 231 S.E. 2d 833 (1977). Items of so-called hearsay were not used for substantive, but for corroborative purposes, and the jury was so instructed. There was no need in these instances for the state to rely on the business records exception to the hearsay rule to admit this evidence. Another item of so-called hearsay was used again not for substantive purposes but to explain why a Dallas police investigator took certain actions to assist the Greensboro Police Department. Defendant's argument regarding lack of chain of custody relates to the admission into evidence of lead fragments removed from Flores' body to prove he was shot with defendant's pistol. The admission of the lead fragments, if error at all, was of absolutely no consequence because defendant acknowledged the victim was shot with defendant's gun. The question for the jury was whether the shooting occurred by accident or by design. As to defendant's attack on an eyewitness's in-court identification of defendant, it suffices to say there is no conflict in the state's and the defendant's evidence as to whether defendant was involved in the altercation leading to Flores' death. Defendant admits he was. The witness's in-court identification of defendant as being at the scene of the shooting is, therefore, inconsequential.

### III.

Defendant's remaining assignments of error are directed toward Judge DeRamus' jury instructions.

### A.

[2] Judge DeRamus instructed the jury it could return verdicts of guilty of murder in the first or second degree, involuntary manslaughter, or not guilty. He instructed on the concept of accident as a theory upon which the jury could return a not guilty verdict. He also instructed the jury that defendant would be excused of involuntary manslaughter on the ground of self-defense if:

First, it appeared to the defendant and he believed it to be necessary to pick up his pistol in order to save himself from death or great bodily harm at the hands of Louie Flores.

Second, the circumstances as they appeared to the defendant at the time were sufficient to create such a belief in the mind of a person of ordinary firmness. It is for you the jury to determine the reasonableness of the defendant's belief from the circumstances as they appeared to him at the time. In making this determination you should consider the circumstances as you find them to have existed from the evidence, including the size, age and strength of the defendant as compared to Louie Flores, the fierceness of the assault, if any, upon the defendant, and whether or not Louie Flores had a weapon in his possession. The defendant would not be guilty of manslaughter if he acted in self-defense as I have just defined that to be; and if he was not [the] aggressor in bringing on the fight. If the defendant voluntarily and without provocation entered the fight, he would be considered the aggressor unless he thereafter attempted to abandon the fight and gave notice to the deceased that he was doing so. One enters a fight voluntarily if he uses toward his opponent abusive language which considering all the circumstances is calculated and intended to bring on a fight. The defendant is not entitled to the benefit of self-defense if he was the aggressor. Therefore, in order for you to find the defendant guilty of involuntary manslaughter the State must prove beyond a reasonable doubt, among other things, that the defendant did not act in self-defense, or failing in this that the defendant was the aggressor.

Defendant argues that Judge DeRamus committed reversible error in failing to submit voluntary manslaughter as a possible verdict. We hold Judge DeRamus properly refused to submit voluntary manslaughter as an alternative verdict.

The state's evidence tended to show a cold, calculated premeditated shooting by defendant. Defendant's evidence, on the other hand, tended to show that he did not shoot Flores intentionally and never intended to harm him. According to defendant's evidence, his gun accidentally discharged as he struggled with

Flores over the gun, which defendant had picked up to convince Flores to stop choking him.

This state of the evidence does not give rise to a possible voluntary manslaughter verdict. In *State v. Wallace*, 309 N.C. 141, 305 S.E. 2d 548 (1983), the state's evidence tended to show that defendant arrived at the home of his girlfriend, Alberta Bethea, the deceased. Defendant appeared intoxicated, and the deceased told him she did not want him to stay. "At that point the defendant, who had his back toward the deceased, stood up, turned around and shot the deceased." *Id.* at 142, 305 S.E. 2d at 550. Defendant's evidence, on the other hand, tended to show that the deceased was shot during a struggle between the two over the gun, and that the shooting was accidental, thus unintentional. The Court held in *Wallace* that there was no evidence to support a verdict of voluntary manslaughter, but that the court erred in not submitting a verdict of guilty of involuntary manslaughter. The Court said in *Wallace*:

> Similarly, there was no evidence to support a verdict of voluntary manslaughter. In general, voluntary manslaughter is an intentional killing without premeditation, deliberation or malice but done in the heat of passion suddenly aroused by adequate provocation or in the exercise of imperfect self-defense where excessive force under the circumstances was used or where the defendant is the aggressor. *State v. Norris*, 303 N.C. 526, 279 S.E. 2d 570 (1981); *State v. Wilkerson*, 295 N.C. 559, 247 S.E. 2d 905 (1978). Clearly, in the present case there was no evidence tending to indicate that the defendant killed the deceased in the heat of passion suddenly aroused by adequate provocation.
>
> In order for an instruction on imperfect self-defense to be required, the first two elements of perfect self-defense must be shown to exist. *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982). As pointed out above, the evidence indicated that the defendant did not in fact form a belief that it was necessary to kill the deceased and, if he did form such a belief, there is no evidence tending to show that such a belief was reasonable under the circumstances. Therefore, there was no basis on which the jury could have found the defendant guilty of voluntary manslaughter.

As previously stated, the State's evidence in the present case, if believed, would only support a verdict of guilty of murder in the second degree. The defendant's evidence, if believed, would support verdicts of guilty of involuntary manslaughter or not guilty by reason of accidental killing. The failure of the trial court to submit the issue of involuntary manslaughter was prejudicial to the defendant and mandates a new trial. Additionally, if the same evidence is presented at retrial, the court should not instruct on self-defense or voluntary manslaughter.

*Wallace,* 309 N.C. at 149, 305 S.E. 2d at 553-54.

*Wallace* controls adversely to the contentions of defendant the question whether the court in the instant case should have submitted voluntary manslaughter as an alternative verdict.

B.

[3] Defendant next assigns error to the trial court's (1) failure to instruct on misadventure or accident; (2) use of the phrase "tends to show" in summarizing the evidence for the state; (3) failure to submit an alternative verdict of not guilty; and (4) charging on self-defense that "the state must prove beyond a reasonable doubt that defendant was not the aggressor."

Defendant refers this Court to no authority for the arguments he presents and, indeed, presents little argument for any of these propositions. The arguments have no merit. Judge De-Ramus did fully and accurately instruct on the doctrine of misadventure and accident. There was no error in introducing a summary of the evidence by use of the phrase "tends to show." Judge DeRamus summarized both the state's and the defendant's evidence using this introductory phrase. Judge DeRamus did give "not guilty" as an alternative verdict. It is clear that Judge DeRamus' statement of the state's burden during his self-defense instruction was a *lapsus linguae* which he immediately rectified by restating the law as follows:

The defendant is not entitled to the benefit of self-defense if he was the aggressor. Therefore, in order for you to find the defendant guilty of involuntary manslaughter the State must prove beyond a reasonable doubt, among other things, that

State v. Blake

the defendant did not act in self-defense, or failing in this that the defendant was the aggressor.

We are satisfied the jury was not misled by the self-defense instructions. Further, since the self-defense instructions were applied only to the offense of involuntary manslaughter, whatever error there might have been in them was cured by the jury's verdict of murder in the first degree. *State v. Wallace*, 309 N.C. 141, 305 S.E. 2d 548; *State v. Bush*, 307 N.C. 152, 297 S.E. 2d 563 (1982); *State v. Freeman*, 275 N.C. 662, 170 S.E. 2d 461 (1969).

C.

[4] Defendant next assigns error to the trial court's failure to adopt twenty-one of his duly proffered jury instructions. Again, this section of defendant's brief cites no supporting authority and gives no specific argument in support of defendant's contentions. It consists essentially of a simple listing of all the proffered instructions defendant contends should have been, but were not, given. After careful examination of the instructions defendant suggested and those actually given, we find: (1) they were given either almost verbatim as defendant requested or else in substance; (2) it was not error to refuse to give those relating to voluntary manslaughter for reasons already expressed; and (3) it was not error to refuse to give self-defense instructions as a defense to murder, *State v. Wallace*, 309 N.C. 141, 305 S.E. 2d 548.

IV.

Defendant's final argument assigns error to Judge DeRamus' refusal to set aside the verdict for errors committed. As we have rejected all of defendant's assignments of error, Judge DeRamus cannot have erred in denying this motion.

We conclude defendant had a fair trial free of reversible error.

No error.