STROUD, Judge.
Defendant Paris Jujuan Todd appeals the trial court's denial of his motion for appropriate relief ("MAR"). On appeal, defendant argues that the trial court erred in denying his MAR because the evidence presented at trial was insufficient to support a conviction and had this been raised during his prior appeal, there is a reasonable probability that defendant's conviction would have been overturned. After reviewing the evidence presented below, we agree, and conclude that the trial court should have granted defendant's MAR. Accordingly, we reverse the trial court's denial of defendant's MAR and remand to the trial court to enter a ruling granting defendant's MAR and vacating his conviction.
Facts
Defendant was convicted of robbery with a dangerous weapon on 14 June 2012 and defendant appealed that conviction to this *353 Court. In his first appeal, defendant raised two issues: "(1) the trial court erred when it denied defendant's motion for a continuance made on the first day of trial, and alternatively, (2) he received ineffective assistance of counsel." State v. Todd , 229 N.C.App. 197, 749 S.E.2d 113, 2013 WL 4460143, *1, 2013 N.C. App. LEXIS 875, *1 (2013) (unpublished) ("Todd I "). This Court found no error, and the Supreme Court denied defendant's petition for discretionary review. State v. Todd , 367 N.C. 322, 755 S.E.2d 612 (2014).
On 21 October 2014, defendant filed an MAR with the trial court. In the MAR, defendant moved that his convictions be vacated and a new trial granted, arguing that he "received ineffective assistance of appellate counsel in that counsel failed to argue that his case should have been dismissed for lack of evidence." In addition, defendant's MAR requested "post-conviction discovery from the State under N.C. Gen. Stat. § 15A-1415(f)." On 15 January 2015, the trial court summarily denied defendant's MAR without a hearing. In its order denying defendant's MAR, the trial court noted as follows:
A review of all the matters of record, including the opinion of the North Carolina Court of Appeals which is attached, clearly demonstrates that the evidence was sufficient to support the jury verdict and appellate counsel rendered effective assistance to Defendant in his appeal.
The Appellate Court was clearly aware of the nature of the fingerprint evidence and determined that such was sufficient to support the Defendant's conviction. Otherwise, the Court was obligated to reverse *354 the conviction upon the Court's own motion.
On 12 March 2015, defendant filed a petition for certiorari of the trial court's order denying his MAR, which this Court allowed on 27 March 2015.
Discussion
I. Denial of MAR
a. Standard of review
"Our review of a trial court's ruling on a defendant's MAR is whether the findings of fact are supported by evidence, whether the findings of fact support the conclusions of law, and whether the conclusions of law support the order entered by the trial court." State v. Peterson , 228 N.C.App. 339, 343, 744 S.E.2d 153, 157 (2013) (internal quotation marks omitted). "The trial court's findings of fact are binding if they are supported by competent evidence and may be disturbed only upon a showing of manifest abuse of discretion. However, the trial court's conclusions are fully reviewable on appeal." State v. Thomsen , --- N.C.App. ----, ----, 776 S.E.2d 41, 48 (quotation marks omitted), disc. review denied , --- N.C. ----, 778 S.E.2d 83 (2015).
In the trial court's order denying defendant's MAR, which is the order at issue in this appeal, there are no findings of fact, and the trial court determined, as a matter of law, that the issues raised by defendant had been considered by this Court in his first appeal and that based upon this Court's opinion, the evidence was sufficient to support the conviction and thus his appellate counsel was not ineffective. We will therefore review this conclusion de novo .
b. "Law of the case" doctrine
Defendant argues that the evidence presented was insufficient to support his conviction, and that the "trial court erred by not granting [defendant's] motion to dismiss, and had this been raised on appeal, there is a reasonable probability that [his] conviction would have been overturned." Before we consider this issue, however, we must determine whether the trial court was correct in its determination that the issues raised by the MAR had already been determined by this Court in defendant's first appeal.
In this case, the trial court determined:
A review of all the matters of record, including the opinion of the North Carolina Court of Appeals which is attached, clearly demonstrates that the evidence was sufficient to support the jury verdict and appellate counsel rendered effective assistance to Defendant in his appeal.
The Appellate Court was clearly aware of the nature of the fingerprint evidence and determined that such was sufficient to support the Defendant's conviction. Otherwise, the Court was obligated to reverse the conviction upon the Court's own motion.
Although it did not use the term, the trial court was recognizing the "law of the case" doctrine in its statement regarding this Court's prior review of defendant's case.
The law-of-the-case doctrine generally provides that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case. The doctrine expresses the practice of courts generally to refuse to reopen what has been decided, but it does not limit courts' power. Thus, the doctrine may describe an appellate court's decision not to depart from a ruling that it made in a prior appeal in the same case.
Musacchio v. United States , --- U.S. ----, ----, 136 S.Ct. 709, 716, 193 L.Ed.2d 639, 648-49 (2016) (citations, quotation marks, and brackets omitted). Based upon the law of the case doctrine, if this Court's prior opinion addressed the sufficiency of the evidence to support defendant's conviction, neither we nor the trial court would be able to review it again and would be bound by that prior ruling.
Yet for the law of the case doctrine to apply, the issue presented must have been both raised and decided in the prior opinion.
[T]he doctrine of the law of the case contemplates only such points as are actually presented and necessarily involved in determining the case. The doctrine does not apply to what is said by the reviewing court, or by the writing justice, on points arising outside of the case and not embodied in the determination made by the Court. Such expressions are obiter dicta and ordinarily do not become precedents in the sense of settling the law of the case.
In every case what is actually decided is the law applicable to the particular facts; all other legal conclusions therein are but obiter dicta .
On the subject of obiter dicta , ... if the statement in the opinion was superfluous and not needed for the full determination of the case, it is not entitled to be accounted a precedent, for the reason that it was, so to speak, rendered without jurisdiction or at least extra-judicial. Official character attaches only to those utterances of a court which bear directly upon the specific and limited questions which are presented to it for solution in the proper course of judicial proceedings. Over and above what is needed for the solution of these questions, its deliverances are unofficial.
True, where a case actually presents two or more points, any one of which is sufficient to support decision, but the reviewing Court decides all the points, the decision becomes a precedent in respect to every point decided, and the opinion expressed on each point becomes a part of the law of the case on subsequent trial and appeal. In short, a point actually presented and expressly decided does not lose its value as a precedent in settling the law of the case because decision may have been rested on some other ground.
The rule that a decision of an appellate court is ordinarily the law of the case, binding in subsequent proceedings, is basically a rule of procedure rather than of substantive law, and must be applied to the needs of justice with a flexible, discriminating exercise of judicial power. Therefore, in determining the correct application of the rule, the record on former appeal may be examined and looked into for the purpose of ascertaining what facts and questions were before the Court.
Hayes v. City of Wilmington , 243 N.C. 525, 536-37, 91 S.E.2d 673, 682-83 (1956) (citations, quotation marks, and ellipses omitted).
Thus, "the law of the case applies only to issues that were decided in the former proceeding, whether explicitly or by necessary implication, but not to questions which might have been decided but were not." Goldston v. State , 199 N.C.App. 618, 624, 683 S.E.2d 237, 242 (2009), aff'd , 364 N.C. 416, 700 S.E.2d 223 (2010). See also Goetz v. N. Carolina Dep't of Health & Human Servs. , 203 N.C.App. 421, 432, 692 S.E.2d 395, 402-03 (2010) ("The law of the case doctrine ... generally prohibits reconsideration of issues which have been decided by the same court, *355 or a higher court, in a prior appeal in the same case." (quotation marks omitted)).
As noted above, the trial court found that issues raised by defendant's MAR were barred by the law of the case doctrine. But for an issue to be barred, it must have been "actually presented and necessarily involved in determining the case" in the first appeal, so we must consider if it was both presented and "necessarily involved" in this court's prior ruling. In the first appeal, defendant raised two issues: (1) "that the trial court committed prejudicial error in denying defendant's motion for a continuance after defense counsel was served with essential discovery material on 11 June 2012, the day before trial [,]" and (2) "that, if the motion for a continuance was properly denied, he is entitled to a new trial because he was denied effective assistance of counsel." Todd I , 229 N.C.App. 197, 749 S.E.2d 113, 2013 WL 4460143, at *2, *4, 2013 N.C. App. LEXIS 875, at *4, *11.
Defendant's arguments in the first appeal focused entirely upon his claim that his motion to continue should have been granted so that he could retain an expert witness to review the fingerprint evidence which had been provided to his counsel only a day before trial. This Court noted that defendant's counsel had been "notified of the State's intention to use fingerprint evidence as early as 18 January 2012" and the case was tried in June 2012. Id. , 2013 WL 4460143, at *2, 2013 N.C. App. LEXIS 875, at *4. This Court stated that
because defense counsel knew the fingerprints would be provided at some point before trial, she had ample opportunity to retain a forensic expert for when the fingerprints eventually arrived. Despite knowing this, in her motion for a continuance counsel only stated that "it does not appear to be clear to me that [the latent fingerprint] might be a perfect match, and I'm asking for a continuance in the fact I need somebody with more expertise than myself to review this."
Moreover, the failure to identify an expert witness also evidences a lack of specificity regarding the reasons for requesting the continuance. Defense counsel failed to show (1) which expert would be called; (2) what testimony would be elicited by the expert; and (3) how defendant's case would have been stronger with expert testimony. In addition to counsel's aforesaid statement, she went on to state that "[i]f you are uninclined to continue the case ... I would ask that you at least give me today to try to find an expert witness that could potentially testify in this case." (Emphasis added.) This vague assertion resembles an "intangible hope" that helpful evidence may surface.
Id. , 2013 WL 4460143, at *3-4, 2013 N.C. App. LEXIS 875, at *9-10 (citations omitted).
In the prior appeal, defendant argued only that he lost an opportunity to have an expert review the evidence in an attempt to demonstrate that the State's forensic evidence was flawed. In his MAR, defendant's argument assumes that the State's evidence was correct and the fingerprint on the backpack was actually his but contends that even if the fingerprint is his, "there was not sufficient evidence to show that [defendant]'s fingerprint could only have been impressed at the time of the crime." Our Supreme Court has noted that
Fingerprint evidence, standing alone, is sufficient to withstand a motion for nonsuit only if there is substantial evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed. What constitutes substantial evidence is a question of law for the court.
Circumstances tending to show that a fingerprint lifted at the crime scene could only have been impressed at the time the crime was committed include statements by the defendant that he had never been on the premises, statements by prosecuting witnesses that they had never seen the defendant before or given him permission to enter the premises, fingerprints impressed in blood.
State v. Irick , 291 N.C. 480, 491-92, 231 S.E.2d 833, 841 (1977) (citations and quotation marks omitted). Thus, defendant did not raise, and this Court's prior opinion did not *356 expressly address, the issue of sufficiency of the evidence to support defendant's conviction.
The trial court, however, went a bit further than the law of the case doctrine allows, as it seems to have based its determination upon the fact that this Court was "clearly aware of the nature of the fingerprint evidence" and must have decided that it was sufficient to support defendant's conviction or this Court was "obligated to reverse the conviction upon the Court's own motion." We are unable to find any case law supporting any "obligation" or even any authority for this Court to sua sponte address sufficiency of the evidence to support a conviction. To the contrary, it is well-established that
Appellate review is limited to those questions clearly defined and presented to the reviewing court in the parties' briefs, in which arguments and authorities upon which the parties rely in support of their respective positions are to be presented. It is not the role of the appellate courts to create an appeal for an appellant, nor is it the duty of the appellate courts to supplement an appellant's brief with legal authority or arguments not contained therein.
First Charter Bank v. Am. Children's Home , 203 N.C.App. 574, 580, 692 S.E.2d 457, 463 (2010) (citations, quotation marks, and ellipses omitted).
The State's brief acknowledges as much, stating: "Assuming this part of the trial court's order is erroneous, it is also immaterial. Omission of this paragraph does not impair the ruling which, as explained above, is otherwise correct." But if we omit this paragraph, we are left only with the first paragraph, which stated that "[a] review of all the matters of record, including the opinion of the North Carolina Court of Appeals which is attached, clearly demonstrates that the evidence was sufficient to support the jury verdict and appellate counsel rendered effective assistance to Defendant in his appeal." We have already determined that the issue of sufficiency of the evidence was not determined in the first appeal so the issue is not barred by the law of the case doctrine and the trial court's ruling is not "otherwise correct." We must therefore consider the issues raised in defendant's MAR.
c. Sufficiency of evidence to support conviction
Defendant argues that the trial court erred in denying his MAR because he received ineffective assistance of appellate counsel. He contends that if the issue of sufficiency of the evidence to support his conviction had been raised in the first appeal, there is a reasonable probability that his conviction would have been reversed.
On a motion for nonsuit the evidence must be considered in the light most favorable to the State, giving the State the benefit of every reasonable inference to be drawn therefrom.
....The test of the sufficiency of the evidence to withstand such a motion is the same whether the evidence is circumstantial, direct, or both. When the motion for nonsuit calls into question the sufficiency of circumstantial evidence, the question for the court is whether a reasonable inference of defendant's guilt may be drawn from the circumstances. If so, it is for the jury to decide whether the facts, taken singly or in combination, satisfy them beyond a reasonable doubt that the defendant is actually guilty.
On the other hand, if the evidence raises merely a suspicion or conjecture as to either the commission of the offense, or defendant's identity as perpetrator, the motion for nonsuit should be allowed.
Irick , 291 N.C. at 491, 231 S.E.2d at 840-41 (citations and quotation marks omitted).
This Court summarized the facts from which defendant's conviction arose in our prior opinion:
Shortly before midnight on 23 December 2011, the Raleigh Police Department responded to a report of an armed robbery at 325 Buck Jones Road. Upon arrival, George Major (the "victim") informed police that, as he was walking home from work, an unknown African-American male approached him from behind, placed his hand on his shoulder, told him to get on the ground if he did not want to be hurt, and then forced him to the ground on his *357 stomach. Once victim was on the ground, a second unknown African-American male approached and held victim's hands while the original assailant went through victim's pockets and felt around victim's clear plastic backpack. As the assailants prepared to flee, they ordered victim to remain facedown on the ground until he counted to 200 because they "didn't want to shoot [him]." Victim complied until he could no longer hear the assailants' footsteps. The assailants took victim's wallet containing an identification card, credit cards, and a small velvet drawstring bag containing change.
During the police investigation, Stacey Sneider of the City-County Identification Bureau was dispatched to assist in processing the backpack for fingerprints. During her analysis, Sneider collected two fingerprints from the backpack, one of which was later determined to be the defendant's right middle finger. As a result, a warrant was issued for defendant's arrest.
On 18 January 2012, Officer Potter of the Raleigh Police Department stopped defendant for illegal tint on his car's windows near the scene of the robbery. During the stop, Officer Potter came across defendant's outstanding warrant and arrested defendant.
Todd I , 229 N.C.App. 197, 749 S.E.2d 113, 2013 WL 4460143, at *1, 2013 N.C. App. LEXIS 875, at *1-3.
Our prior opinion noted only the fingerprint evidence's existence because of the limited issues presented on appeal. In this appeal, we focus on whether "there is substantial evidence of circumstances from which the jury can find that the fingerprints could only have been impressed at the time the crime was committed." Irick , 291 N.C. at 492, 231 S.E.2d at 841 (quotation marks omitted). Defendant argues that the fingerprint evidence here "stood alone" since the single, partial fingerprint was the only evidence that connected defendant to this crime. The question of whether there is "substantial evidence" is a question of law and thus we consider this issue de novo. Id .
We first note that many of the cases cited by the State regarding fingerprint evidence address evidence found at the "scene" of the crime, usually a building of some sort, Irick , 291 N.C. at 486, 231 S.E.2d at 838 (defendant's fingerprint found on victim's window sill); State v. Jackson , 284 N.C. 321, 334, 200 S.E.2d 626, 634 (1973) (testimony offered that latent fingerprint on window matched defendant's fingerprint on file); or upon an item stolen from the victim, State v. Blackmon , 208 N.C.App. 397, 402, 702 S.E.2d 833, 837 (2010) (defendant's fingerprint found on computer tower in front lawn); State v. Boykin , 78 N.C.App. 572, 575, 337 S.E.2d 678, 680 (1985) (defendant's fingerprint found on stolen radio). In this instance, however, the backpack was not stolen and none of the items removed from it were ever recovered. In addition, the backpack is not a stationary crime "scene" but rather is a moveable object which Mr. Major had owned for about six months prior to the crime and wore regularly on the way to and from work, riding on a public bus, and which he left unattended on a coatrack while he worked in a local restaurant. Defendant's single partial fingerprint, as well as other unidentified fingerprints, were found on the exterior of the backpack, on the outside surface, not the surface which would be against the back of the wearer.
The circumstances of the crime alone provide no evidence which might show that "the fingerprint[ ] could only have been impressed at the time the crime was committed." Irick , 291 N.C. at 492, 231 S.E.2d at 841 (quotation marks omitted). The State's evidence showed that on 23 December 2011, officers responded to the scene of the crime immediately upon Mr. Major's call. He was unable to give any detailed physical description of his assailants and could tell only that they were African American men. He was able to discern that the hands of the man holding his wrists were "rough-skinned, callused hands" and that one man's jacket sleeves were tan and the other man's sleeves were dark blue or black. He was able to clearly hear the men's voices. The officers used a canine to see if they could pick up a track for the two assailants, and Officer Martinez testified that he thought the dog had picked up a track, but it ended in a parking lot off Portree Road, *358 north of where the incident occurred. They did not find either assailant that night.
After fingerprints were lifted from the backpack, they were compared to those in a database, which generated several potential matches, and ultimately it was determined that one partial fingerprint matched Defendant's right middle finger. Detective Codrington, who had investigated the incident, received information of the match on the fingerprint from the backpack in January. He then showed a picture of defendant to Mr. Major to see if he was "a friend of his" but Mr. Major did not recognize him. On 12 January 2012, he obtained the arrest warrant for defendant based upon the fingerprint.
On 18 January 2012, Officer Potter of the Raleigh Police Department stopped defendant's vehicle in the Westcliff Court neighborhood off of Buck Jones Road for illegally tinted windows. Defendant was driving down a dead-end road before he was stopped. The place where defendant's car was stopped was "approximately about a few hundred yards" from the location on Buck Jones Road where Mr. Major had been robbed on 23 December 2011. After checking his license, Officer Potter asked defendant "what he was doing in the area" and he was "kind of hesitant about if he lived there or if he was visiting. Said he was stopping by to see a friend, wouldn't provide any information as to exactly where the friend was as far as which apartment." Another officer arrived to confirm the percentage of tint on the windows, which was "15 percent which is illegal" so he began to write a citation. Upon checking on defendant's license, Officer Potter discovered the outstanding warrant for defendant's arrest and then arrested him. When Officer Potter told defendant that he was under arrest for robbery, defendant's response was that "he seemed more preoccupied with us getting away from the vehicle. It wasn't like shocking as far as a warrant." He seemed "very nervous" but wanted "to try and hurry up to get transported wherever." Defendant's car was secured in accordance with protocol at the scene where he was arrested, but it was not searched.
Officer Potter transported defendant to Detective Codrington's office. When Detective Codrington entered the interrogation room where defendant was waiting, he noted that defendant was sleeping and he thought that "a reasonable person would have been a little more upset being charged about something that they didn't do and not sleeping in the interrogation room." Detective Codrington read defendant his Miranda rights; defendant agreed to talk to him and the interview was videotaped. Detective Codrington described defendant as a "pretty well-educated, well-spoken individual." Defendant "denied any involvement in the robbery." He asked defendant where he lived, and he said he was "back and forth between his mom's house in Apex" and "his sister's grandmother's house close to downtown." Detective Codrington asked defendant where he was picked up, and defendant said "Westcliff" and then that " 'I used to be over there but,' and then trailed off." Neither the Westcliff Court address which was "the closest residence we could in that area kind of associate him with" or any of the residences where defendant mentioned staying was ever searched. Defendant was unable to tell Detective Codrington where he was on the night of 23 December 2011. Detective Codrington asked defendant how his fingerprint might have gotten on the backpack, and he said "maybe a friend of his had gotten robbed or something and now the bag was in the victim's possession, something around that."
Detective Codrington also testified that Westcliff Court, where defendant was stopped, was "about 300 yards from the scene of the crime" and described this fact as important to him because it was "very, very close as far as the proximity, and it would explain and kind of explained to me from the direction that the person ran from after, explains that sort of in the direction of Westcliff Court and Little Sue's Mini-mart which everybody cuts behind." Detective Codrington also talked to defendant's mother and from his investigation, he determined that "all information that I could gather at that point kind of led me to him living at 448 Westcliff Court."
Detective Codrington described the area around the scene of the incident, noting that Westcliff was an apartment complex and *359 there were also private residences nearby on Buck Jones Road. The canine unit had lost the trail on the night of 23 December on Portree Place, a "little private street from the townhouse they sort of plopped in the middle." Portree Place is a loop or "half moon" with a group of private townhomes as well as "two other separate buildings ... right next to those townhomes." In regard to where the canine stopped tracking, Detective Codrington noted that "[a]ll the canine therefore is looking at recently, recently traveled properties, so if it gets into an apartment complex, typically if a bunch of people just happen to walk past that place, the canine track will stop because it's confusing the dog. So highly traveled properties aren't good for initial canine searches as opposed to when they have somebody, like somebody's scent on somebody's property where they're following." He described the layout of the buildings as "like old Army housing" with a "common area that you walk in. There's no doors on that side. You just kind of walk into the common area, and then once you get into the building, it's either five or six units on each side of the hall, and then upstairs, the same way, so it didn't track to a specific door or anything."
We are unable to find any evidence, much less substantial evidence, of "[c]ircumstances tending to show that a fingerprint lifted at the crime scene could only have been impressed at the time the crime was committed[.]" Id . The State notes several prior cases which have identified some of the circumstances which may be sufficient. In State v. Miller , 289 N.C. 1, 6, 220 S.E.2d 572, 575 (1975), our Supreme Court referenced false statements by the defendant that he had never been on the premises. In this case, however, there are no premises involved. In Jackson, our Supreme Court noted that the victim testified that she did not know the defendant, had never seen him prior to when he entered her apartment, and that "[n]othing appears in the record to show that defendant had ever been in the apartment occupied by [the victim] prior to [the date of the offense]." 284 N.C. at 335, 200 S.E.2d at 635. In Jackson, the victim was able to identify the defendant by his voice. Id. Here, by contrast, although the victim heard his assailants speak, no identification was made based on voice recognition. Moreover, as we have already pointed out, in this case, there are no "premises," only a mobile backpack.
In Blackmon, the defendant's fingerprint was found a computer tower left on the grass outside the house that had been broken into. 208 N.C.App. at 402, 702 S.E.2d at 837. This Court held that the evidence was sufficient to show that the defendant was the perpetrator of the crime. Id . at 403, 702 S.E.2d at 837. Similarly, in Boykin, the defendant's fingerprint was found on a stolen radio, which this Court concluded was enough to support his conviction for larceny. 78 N.C.App. at 575, 337 S.E.2d at 680. In the present case, however, the stolen items were never recovered, and only fingerprint evidence found was the partial print linking defendant to the victim's mobile backpack.
In State v. Thomas , 291 N.C. 687, 688, 231 S.E.2d 585, 586 (1977), the Supreme Court referenced fingerprints impressed in blood, but those fingerprints were found on a serrated steak knife and a Cheerios box in the kitchen of the victim's home, where the victim had been stabbed to death. In addition, about $400.00 to $500.00 cash was missing from the Cheerios box, and defendant had been aware that the victim kept cash in the Cheerios box. Id . There is simply no comparable evidence in this case.
The State also argues that if other evidence, taken alongside the fingerprint, permits a reasonable inference that defendant was the perpetrator, the trial court should deny the motion to dismiss. The State argues that there is "other evidence" connecting defendant to the robbery. Specifically, the State notes that "[d]efendant was arrested within a month of the robbery and only a few hundred yards from the crime scene." That is true, but defendant was stopped on Westcliff Court for a tinted window violation. And it is clear from the State's evidence that the area where defendant was stopped was a public street in a residential area with many apartments, townhomes, and private residences.
Although being found in close proximity to a crime scene at or very near the time of a crime may be "other evidence" which could *360 connect a defendant to the crime, we have been unable to determine how defendant's presence in the general vicinity nearly a month after the crime was committed is relevant. The State cites to Irick, where the Supreme Court noted that "defendant's print was found on the inside frame of the window from which the tissue box and pasteboard had been removed on the night of the burglary, but other unidentified prints were found on and around the same window. These facts do not constitute 'substantial' evidence that the print could have only been impressed at the time of the alleged burglary." 291 N.C. at 492, 231 S.E.2d at 841. In Irick, the court determined that "other circumstances" could support a reasonable inference that defendant was the perpetrator. Id. Specifically,
Defendant was observed by a police officer coming from the general direction of the Hipp home shortly after the burglary transpired; defendant had in his pocket at the time of his arrest loose bills in the same denominations and total amount as those stolen from the Hipp house; defendant was tracked by the bloodhound from the Wood home to the place where the stolen vehicle was parked (the dirty kitchen towel linked the Hipp and Wood burglaries), and defendant attempted to flee from police officers shortly after the burglaries took place.
Id. , 231 S.E.2d at 841-42.
The only resemblance this case bears to Irick is the presence of a fingerprint identified as defendant's along with other unidentified fingerprints, in a place that could suggest that it may be been impressed at the time of the crime. None of the "other circumstances" are present. Defendant was not seen anywhere near the scene of the crime when it occurred. None of the stolen property was ever recovered. The canine was unable determine exactly where the perpetrators went, having lost the track in a heavily travelled courtyard. No one tried to flee from the officers on the night of the crime, and no physical evidence of any sort other than the lone partial print on the outside of the backpack connected defendant to the incident.
The State also argues that that fact that Detective Codrington "believed Defendant lived on Westcliff Court, where his vehicle was stopped" somehow "supports a reasonable inference of guilt,"[1] citing to State v. Cross , 345 N.C. 713, 483 S.E.2d 432 (1997). In Cross, the victim was attacked as she got into her car, and the assailant beat her and forced her to get into the back seat. He took her wallet and ATM card and drove her car to make "numerous stops for money" and eventually stopped the car and left. Id. at 715, 483 S.E.2d at 434. The State's evidence showed a "latent fingerprint on the edge of the left rear door of the victim's vehicle" which was from
only one finger and was a portion of the finger, "like it had been cut off." This fact prompted Agent Duke to process the rear quarter panel adjacent to the area where the print was found on the rear door. No fingerprints or partial fingerprints were found in the area adjacent to the left rear door. In other words, the rear portion or remainder of this partial print did not extend over to the rear quarter panel of the car. Agent Joseph Ludas, a latent print examiner with the City/County Bureau of Identification, testified, as an expert in the field of fingerprint identification, that the latent fingerprint found on the left rear door of the victim's vehicle matched the right index finger of the defendant.
The fact that the defendant's fingerprint was only a partial print, which was cleanly cut off and did not extend over to the rear quarter panel, strongly suggests that the door was open when the defendant's finger contacted the vehicle. The evidence is uncontradicted that the only time the rear driver's side door was opened during the victim's stay in Raleigh was when the assailant opened the door and shoved the victim into the backseat. Moreover, Agent Ludas testified that a lot of pressure and twisting was used when the defendant's finger made contact with the vehicle. This *361 fact, when viewed in the light most favorable to the State, logically suggests that the print was left as defendant pushed the back door closed. The fingerprint evidence is consistent with the victim's account of the crime and does not support an inference that the defendant merely touched the victim's automobile while walking through the Crabtree Sheraton parking lot.
Id. at 718, 483 S.E.2d at 435.
The Supreme Court held in Cross that this evidence was sufficient to show that the defendant's fingerprint "could only have been impressed at the time the crime was committed." Id. at 718, 483 S.E.2d at 435. The Court then noted that although the fingerprint evidence alone was sufficient to survive the motion to dismiss, there was other "corroborating evidence" that
the assailant abandoned the victim within blocks of where the defendant was frequently seen and where defendant was eventually located and arrested, that a pathway existed near that location which led to the back of the apartment defendant was in when he was arrested, that the defendant made efforts to change his appearance by shaving his head, that the defendant made an effort to evade arrest, and that the defendant repeatedly denied to police officers that his name was "Cross."
Id. at 718-19, 483 S.E.2d at 435-36.
Cross bears more resemblance to this case than the others cited by the State, since the fingerprint was on a mobile object and not stationary premises or a weapon. In Cross, however, the decisive factor was the victim's description of exactly how the assailant had grabbed the car door, which was consistent with the characteristics of the print that was found in the place she described. Id. at 718, 483 S.E.2d at 435. Here, by contrast, the fingerprint had no distinguishing features which would indicate how or when it was impressed, and it was on the outside of the backpack. And the other "corroborating evidence" noted in Cross was far stronger than here, as the Cross defendant was arrested in an apartment which was at the end of the pathway near where he left the victim and her car, altered his appearance, and denied his name. Id. at 718-19, 483 S.E.2d at 435-36. Here, at the most, defendant had an apartment residence in a densely populated area of townhouses and apartments in the general vicinity of the place where a canine lost a trail nearly a month before the defendant's arrest on a public street nearby. This is simply not comparable to the evidence noted in other cases addressing "other circumstances" which along with fingerprint evidence connects a defendant to a crime. Many people had residences in that area, and other unidentified fingerprints were also found on the backpack.
The State also argues that "although Mr. Major could not identify who robbed him, his description of his assailant's manner of speaking was consistent with Defendant's manner of speaking," citing to two places in the trial transcript. We give the State the benefit of every reasonable inference from the evidence, but still the State's implication that defendant was identified by his voice goes far beyond anything the record can support. First, although the jury did hear the videotaped recording of the interview with defendant, Mr. Major never identified the voice in that video as sounding like one of the men who assaulted him. Mr. Major's entire testimony about the voices was the following:
Q. You were able to hear these assailants talk; is that correct?
A. Yes.
Q. What if anything did you notice about the language that they used?
A. They didn't use a lot of eubonics [sic]. They spoke to me very clearly. I understood what they were saying.
The other evidence cited by the State is Detective Codrington's testimony regarding his interview of defendant:
Q. You had the opportunity to speak to him that night?
A. Yes.
Q. He's a pretty well-educated, well-spoken individual?
A. Yes.
Defendant argues that State v. Scott, 296 N.C. 519, 522, 251 S.E.2d 414, 417 (1979)
*362 most resembles his, since in that case the single thumbprint of the defendant stood alone, with no other evidence to show that it "could only have been placed on the box at the time of the homicide." We agree that there are similarities and comparisons that can be drawn. In Scott, the defendant's thumbprint was found in the victim's home on a "small metal box on top of the desk in the den." Id. at 521, 251 S.E.2d at 416. The box contained papers and "odds and ends" and was kept in a closed but unlocked filing cabinet in the den. Id . The victim was found in the home, dead, shot through the head, with his hands and feet tied with tape. Id. at 520, 251 S.E.2d at 415. The house had been ransacked and the deceased's pocket watch and money from his wallet had been stolen. Id . at 520-21, 251 S.E.2d at 415-16. Ms. Goodnight, who also lived in the home, testified that the defendant was " 'a total stranger' " and she had never seen him and he had never visited the house to her knowledge. Id . at 521, 251 S.E.2d at 416. She notified the police immediately upon finding her uncle on the floor and was careful not to disturb anything in the house until after the officers "completed their investigation." Id . The Supreme Court found that this single thumbprint, standing alone, was not sufficient to support defendant's conviction. Id . at 526, 251 S.E.2d at 419.
The Scott Court analyzed other cases in which a fingerprint was found on the premises of the crime and noted that in those cases, "the prosecuting witnesses were in a position to have personal knowledge of all persons visiting the premises and ... there was some additional evidence of guilt." Id . at 525, 251 S.E.2d at 418. The Court noted that in Scott, Ms. Goodnight "was simply not in a position to know who came into the house 'during the five week days' " since she worked during the week, while her uncle who was retired, remained at home. Id . at 526, 251 S.E.2d at 419. The State's expert testified that the print could have been placed on the box "several weeks before the homicide." Id .
Ultimately, the Court concluded that
In the light of all these facts, we are constrained to hold that the evidence was insufficient to withstand a motion to dismiss. The burden is not upon the defendant to explain the presence of his fingerprint but upon the State to prove his guilt.... We reach the conclusion that the evidence introduced in the present case is sufficient to raise a strong suspicion of the defendant's guilt but not sufficient to remove that issue from the realm of suspicion and conjecture.
Id . at 526, 251 S.E.2d at 419 (citations and quotation marks omitted).
The State argues that "[d]efendant's inability to offer a plausible explanation when initially confronted with the evidence supports a reasonable inference of guilt." The State describes defendant's argument in his brief that the fingerprint may have been impressed "while the backpack was on a crowded bus or on the coat rack at Red Lobster" (where Mr. Major worked) as "unavailing." Yet the flaw in the State's argument is that "[t]he burden is not upon the defendant to explain the presence of his fingerprint but upon the State to prove his guilt." Id . The State's evidence was that the print could have been on the backpack for "10 seconds or 10 days or 10 months" and that Mr. Major regularly wore the backpack on a crowded bus to and from work. He also left it unattended on a coat rack at work. If in the Scott case, Ms. Goodnight's testimony that she was not aware of defendant ever having been in her home was not sufficient to show that the thumbprint could not have been impressed at any other time than when her uncle was killed, certainly we cannot say that there was no other opportunity for defendant to impress a print on the outside of a backpack that has regularly been exposed to the public. In this regard, defendant's apartment near the scene of the crime does not favor the State's case, since that could make it more likely that he was on the same bus with Mr. Major during the months before the incident and may have inadvertently touched the bag.
Citing only to Cross , 345 N.C. at 718-19, 483 S.E.2d at 435-36 the State also argues that defendant's behavior was "incompatible with innocence" because he was "not surprised" when he was arrested and he fell asleep in the interrogation room. We are *363 unable to determine how Cross supports this proposition. In Cross, the defendant "shav[ed] his head, ... made an effort to evade arrest, and ... repeatedly denied to police officers that his name was 'Cross.' " Id . at 719, 483 S.E.2d at 436. This behavior could be seen as "incompatible with innocence." Here, in comparison, defendant was not particularly nervous, even when he was stopped, and he was not evasive. He simply maintained his innocence during his questioning and denied knowing anything about the crime, but the State argues that even this is incriminating. The State has not cited any case in which an absence of nervousness was seen as evidence of guilt; typically we see exactly the opposite evidence and argument. See, e.g. , State v. McClendon , 350 N.C. 630, 638, 517 S.E.2d 128, 134 (1999) (discussing the use of nervousness in determination of reasonable suspicion of criminal activity and noting that "[n]ervousness, like all other facts, must be taken in light of the totality of the circumstances. It is true that many people do become nervous when stopped by an officer of the law. Nevertheless, nervousness is an appropriate factor to consider when determining whether a basis for a reasonable suspicion exists." (Citations omitted)).
As we observed upon a similar occasion in State v. Cutler , 271 N.C. 379, 383, 156 S.E.2d 679, 682 (1967), we reach the conclusion that the evidence introduced in the present case "is sufficient to raise a strong suspicion of the defendant's guilt but not sufficient to remove that issue from the realm of suspicion and conjecture." See also State v. Jones , 280 N.C. 60, 67, 184 S.E.2d 862, 866 (1971) ("The circumstances raise a strong suspicion of defendant's guilt, but we are obliged to hold that the State failed to offer substantial evidence that defendant was the only who shot his wife in the back. The evidence proves only that at the time his wife was killed defendant was degradedly drunk and intermittently violent."); State v. Minton , 228 N.C. 518, 521, 46 S.E.2d 296, 298 (1948) ("The circumstances relied on by the State are inconclusive and do not lead to a satisfactory deduction that the accused, and no one else, perpetrated the crimes alleged in this action. All of these circumstances can be true, and the defendant can still be innocent.").
After considering all of the State's evidence in light of the applicable cases, we cannot find that there was substantial evidence to show that defendant's fingerprint could have only been impressed at the time of the crime, and thus, the trial court should have allowed defendant's motion to dismiss.
d. Ineffective assistance of counsel
Defendant argues that his appellate counsel in the first appeal "performed below an objective standard of reasonableness by failing to argue that the evidence was insufficient."
The United States Supreme Court has set forth the test for determining whether a defendant received constitutionally ineffective assistance of counsel, which our Supreme Court expressly adopted in State v. Braswell , 312 N.C. 553, 562-63, 324 S.E.2d 241, 248 (1985). Pursuant to the two-part test, First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Strickland v. Washington , 466 U.S. 668, 687[, 104 S.Ct. 2052, 2064] (1984). With respect to the first element, "a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id . at 689[, 104 S.Ct. at 2065], 80 L.Ed.2d at 694-95 (citation and internal quotation marks omitted). The second element of the Strickland test requires that the defendant show "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine *364 confidence in the outcome." Id . at 694[, 104 S.Ct. at 2068], 80 L.Ed.2d at 698. Our Supreme Court also has noted that defendants who seek to show ineffective assistance of counsel must satisfy both prongs: "[I]f a reviewing court can determine at the outset that there is no reasonable probability that in the absence of counsel's alleged errors the result of the proceeding would have been different, then the court need not determine whether counsel's performance was actually deficient." Braswell , 312 N.C. at 563, 324 S.E.2d at 249.
Blackmon , 208 N.C.App. at 400-01, 702 S.E.2d at 836.
As to the first prong of the Strickland test, the State argues that defendant's prior appellate counsel "apparently made a strategic decision to pursue the constitutional claim that the trial court's failure to grant a continuance deprived him of adequate time to prepare a defense" and that he "received ineffective assistance of trial counsel." The State does not explain how omission of this issue could be a "strategic" decision. The law regarding fingerprint evidence was well-established at the time of the first appeal and it has not changed since then. The issues and arguments presented in the first appeal are not mutually exclusive or conflicting to the issue of sufficiency of the evidence. The text of the brief in defendant's first appeal was only about 19 pages, so the page limitations of our Appellate Rules did not force counsel to make a "strategic decision" to limit the brief to the two issues presented.
As to the second prong of Strickland, the State argues that "[d]efendant was not prejudiced by counsel's failure to challenge the sufficiency of the evidence on appeal" because the evidence was sufficient. But we have determined that there is " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different' " in the first appeal, had the issue of sufficiency of the evidence been raised. Blackmon , 208 N.C.App. at 401, 702 S.E.2d at 836 (quoting Strickland , 466 U.S. at 687, 104 S.Ct. at 2064, 80 L.Ed.2d at 694-95 ). As discussed above, if defendant had raised this issue in his first appeal, this Court would have addressed it and there is a reasonable probability that we would have come to the same result as we have in this opinion, which is that the trial court should have allowed defendant's motion to dismiss. Therefore, the trial court erred by failing to grant defendant's MAR.
We have determined that defendant had ineffective assistance of appellate counsel in his first appeal and that he likely would have been successful had he raised sufficiency of the evidence. Defendant's motion did not raise any factual issues, only the legal question of sufficiency of the evidence, so there was no need for an evidentiary hearing and the trial court should have granted the MAR. Moreover, since we find that defendant's MAR should have been granted and that he has established that the fingerprint evidence presented at trial was insufficient, we need not address his request for post-conviction discovery. See, e.g. , State v. McDowell , 217 N.C.App. 634, 638, 720 S.E.2d 423, 425 (2011) ("Because we find that the trial court erred in denying defendant's motion to dismiss, we do not reach defendant's other arguments.").
Conclusion
In sum, we find that the trial court erred in concluding that defendant received effective assistance of his appellate counsel because the State presented insufficient evidence that defendant committed the underlying offense, and if defendant's appellate counsel had raised this issue in the initial appeal, defendant's conviction would have been reversed. Consequently, we hold that the trial court's denial of defendant's MAR was in error. We, therefore, reverse the trial court's order and remand to the trial court to enter an order granting defendant's MAR and vacating the defendant's conviction.
REVERSED AND REMANDED.
Judge DIETZ concurs with separate opinion.
Judge TYSON dissents.

The State also notes that "[d]efendant now admits that he kept an apartment on Westcliff Court." But this "admission" is in defendant's post-trial affidavit filed in support of his MAR and is not in the evidence presented at trial.